(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LUIS *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 14–419.   Argued November 10, 2015—Decided March 30, 2016

A federal statute provides that a court may freeze before trial certain assets belonging to a defendant accused of violations of federal health care or banking laws.  Those assets include (1) property "obtained as a result of" the crime, (2) property "traceable" to the crime, and (3), as relevant here, other "property of equivalent value."  18 U. S. C. §1345(a)(2).   The Government has charged petitioner Luis with fraudulently obtaining nearly $45 million through crimes related to health care.  In order to preserve the $2 million remaining in Luis' possession for payment of restitution and other criminal penalties, the Government secured a pretrial order prohibiting Luis from dissipating her assets, including assets unrelated to her alleged crimes.  Though the District Court recognized that the order might prevent Luis from obtaining counsel of her choice, it held that the Sixth Amendment did not give her the right to use her own untainted funds for that purpose.  The Eleventh Circuit affirmed.

*Held*: The judgment is vacated, and the case is remanded.

564 Fed. Appx. 493, vacated and remanded.

JUSTICE BREYER, joined by THE CHIEF JUSTICE, JUSTICE GINSBURG, and JUSTICE SOTOMAYOR, concluded that the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment.  The nature and importance of the constitutional right taken together with the nature of the assets lead to this conclusion. Pp. 3–16.

   (a) The Sixth Amendment right to counsel grants a defendant "a fair opportunity to secure counsel of his own choice," *Powell* v. *Alabama*, 287 U. S. 45, 53, that he "can afford to hire," *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 624.  This Court has

consistently referred to the right to counsel of choice as "fundamental."  Pp. 3–5.

  (b) While the Government does not deny Luis' fundamental right to be represented by a qualified attorney whom she chooses and can afford to hire, it would nonetheless undermine the value of that right by taking from Luis the ability to use funds she needs to pay for her chosen attorney.  The Government attempts to justify this consequence by pointing out that there are important interests on the other side of the legal equation.  It wishes to guarantee that funds will be available later to help pay for statutory penalties and restitution, for example.  The Government further argues that two previous cases from this Court, *Caplin & Drysdale*, *supra*, at 619, and *United States* v. *Monsanto*, 491 U. S. 600, 615, support the issuance of a restraining order in this case.  However, the nature of the assets at issue here differs from the assets at issue in those earlier cases.  And that distinction makes a difference.  Pp. 5–16.

    (1) Here, the property is untainted, *i.e.*, it belongs to Luis.  As described in *Caplin & Drysdale* and *Monsanto*, the Government may well be able to freeze before trial "tainted" assets—*e.g.*, loot, contraband, or property otherwise associated with the planning, implementing, or concealing of a crime.  As a matter of property law, the defendant's ownership interest in such property is imperfect.  For example, a different federal statute provides that title to property used to commit a crime (or otherwise "traceable" to a crime) passes to the Government at the instant the crime is planned or committed.  See 21 U. S. C. §853(c).  But here, the Government seeks to impose restrictions upon Luis' untainted property without any showing of any equivalent governmental interest in that property.  Pp. 5–10.

    (2) This distinction does not by itself answer the constitutional question because the law of property may allow a person without a present interest in a piece of property to impose restrictions upon a current owner, say, to prevent waste.  However, insofar as innocent funds are needed to obtain counsel of choice, the Sixth Amendment prohibits the court order sought here.

  Three basic considerations lead to this conclusion.  First, the nature of the competing interests argues against this kind of court order.  On the one side is a fundamental Sixth Amendment right to assistance of counsel.  On the other side is the Government's interest in securing its punishment of choice, as well as the victim's interest in securing restitution.  These latter interests are important, but—compared to the right to counsel—they seem to lie somewhat further from the heart of a fair, effective criminal justice system.  Second, relevant, common-law legal tradition offers virtually no significant support for the Government's position and in fact argues to the con-

trary. Indeed, there appears to be no decision of this Court authorizing unfettered, pretrial forfeiture of the defendant's own "innocent" property. Third, as a practical matter, accepting the Government's position could erode the right to counsel considerably. It would, in fact, unleash a principle of constitutional law with no obvious stopping place, as Congress could write more statutes authorizing restraints in other cases involving illegal behavior that come with steep financial consequences. These defendants, often rendered indigent, would fall back upon publicly paid counsel, including overworked and underpaid public defenders. The upshot is a substantial risk that accepting the Government's views would render less effective the basic right the Sixth Amendment seeks to protect. Pp. 11–15.

(3) The constitutional line between a criminal defendant's tainted funds and innocent funds needed to pay for counsel should prove workable. Money may be fungible, but courts, which use tracing rules in cases of, *e.g.*, fraud and pension rights, have experience separating tainted assets from untainted assets, just as they have experience determining how much money is needed to cover the costs of a lawyer. Pp. 15–16.

JUSTICE THOMAS concluded that the rule that a pretrial freeze of untainted assets violates a defendant's Sixth Amendment right to counsel of choice rests strictly on the Sixth Amendment's text and common-law backdrop. Pp. 1–12.

(a) The Sixth Amendment abolished the common-law rule that generally prohibited representation in felony cases. "The right to select counsel of one's choice" is thus "the root meaning" of the Sixth Amendment right to counsel. *United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 147–148. Constitutional rights protect the necessary prerequisites for their exercise. As a result, the Sixth Amendment denies the Government unchecked power to freeze a defendant's assets before trial simply to secure potential forfeiture upon conviction. Unless the right to counsel protects the right to use lawfully owned property to pay for an attorney, the right to counsel—originally understood to protect only the right to hire counsel of choice—would be meaningless. Without pretrial protection for at least *some* of a defendant's assets, the Government could nullify the right to counsel of choice, eviscerating the Sixth Amendment's original meaning and purpose. The modern, judicially created right to government-appointed counsel does not obviate these concerns. Pp. 1–5.

(b) History confirms this textual understanding. The common-law forfeiture tradition provides an administrable rule for the Sixth Amendment's protection: A criminal defendant's untainted assets are protected from government interference before trial and judgment, but his tainted assets may be seized before trial as contraband or

Syllabus

through a separate *in rem* proceeding. Reading the Sixth Amendment to track the historical line between tainted and untainted assets avoids case-by-case adjudication and ensures that the original meaning of the right to counsel does real work. Here, the incursion of the pretrial asset freeze into untainted assets, for which there is no historical tradition, violates the Sixth Amendment. Pp. 5–9.

    (c) This conclusion leaves no room for an atextual balancing analysis. Pp. 9–12.

BREYER, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and GINSBURG and SOTOMAYOR, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. KENNEDY, J., filed a dissenting opinion, in which ALITO, J., joined. KAGAN, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–419

SILA LUIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[March 30, 2016]

JUSTICE BREYER announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE, JUSTICE GINSBURG, and JUSTICE SOTOMAYOR join.

A federal statute provides that a court may freeze before trial certain assets belonging to a criminal defendant accused of violations of federal health care or banking laws. See 18 U. S. C. §1345. Those assets include: (1) property "obtained as a result of" the crime, (2) property "traceable" to the crime, and (3) other "property of equivalent value." §1345(a)(2). In this case, the Government has obtained a court order that freezes assets belonging to the third category of property, namely, property that is untainted by the crime, and that belongs fully to the defendant. That order, the defendant says, prevents her from paying her lawyer. She claims that insofar as it does so, it violates her Sixth Amendment "right . . . to have the Assistance of Counsel for [her] defence." We agree.

## I

In October 2012, a federal grand jury charged the petitioner, Sila Luis, with paying kickbacks, conspiring to commit fraud, and engaging in other crimes all related to health care. See §1349; §371; 42 U. S. C. §1320a–

7b(b)(2)(A). The Government claimed that Luis had fraudulently obtained close to $45 million, almost all of which she had already spent. Believing it would convict Luis of the crimes charged, and hoping to preserve the $2 million remaining in Luis' possession for payment of restitution and other criminal penalties (often referred to as criminal forfeitures, which can include innocent—not just tainted—assets, a point of critical importance here), the Government sought a pretrial order prohibiting Luis from dissipating her assets. See 18 U. S. C. §1345(a)(2). And the District Court ultimately issued an order prohibiting her from "dissipating, or otherwise disposing of . . . assets, real or personal . . . up to the equivalent value of the proceeds of the Federal health care fraud ($45 million)." App. to Pet. for Cert. A–6.

The Government and Luis agree that this court order will prevent Luis from using her own untainted funds, *i.e.*, funds not connected with the crime, to hire counsel to defend her in her criminal case. See App. 161 (stipulating "that an unquantified amount of revenue not connected to the indictment [had] flowed into some of the accounts" subject to the restraining order); *ibid.* (similarly stipulating that Luis used "revenue not connected to the indictment" to pay for real property that she possessed). Although the District Court recognized that the order might prevent Luis from obtaining counsel of her choice, it held "that there is no Sixth Amendment right to use untainted, substitute assets to hire counsel." 966 F. Supp. 2d 1321, 1334 (SD Fla. 2013).

The Eleventh Circuit upheld the District Court. See 564 Fed. Appx. 493, 494 (2014) (*per curiam*) (referring to, *e.g.*, *Kaley* v. *United States*, 571 U. S. ___ (2014); *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 631 (1989); *United States* v. *Monsanto*, 491 U. S. 600, 616 (1989)). We granted Luis' petition for certiorari.

II

The question presented is "[w]hether the pretrial restraint of a criminal defendant's legitimate, untainted assets (those not traceable to a criminal offense) needed to retain counsel of choice violates the Fifth and Sixth Amendments." Pet. for Cert. ii. We see no reasonable way to interpret the relevant statutes to avoid answering this constitutional question. Cf. *Monsanto*, *supra*, at 614. Hence, we answer it, and our answer is that the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment. The nature and importance of the constitutional right taken together with the nature of the assets lead us to this conclusion.

A

No one doubts the fundamental character of a criminal defendant's Sixth Amendment right to the "Assistance of Counsel." In *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), the Court explained:

> "'The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not

know how to establish his innocence.'" *Id.*, at 344–345 (quoting *Powell* v. *Alabama*, 287 U. S. 45, 68–69 (1932)).

It is consequently not surprising: *first*, that this Court's opinions often refer to the right to counsel as "fundamental," *id.*, at 68; see *Grosjean* v. *American Press Co.*, 297 U. S. 233, 243–244 (1936) (similar); *Johnson* v. *Zerbst*, 304 U. S. 458, 462–463 (1938) (similar); *second*, that commentators describe the right as a "great engin[e] by which an innocent man can make the truth of his innocence visible," Amar, Sixth Amendment First Principles, 84 Geo. L. J. 641, 643 (1996); see *Herring* v. *New York*, 422 U. S. 853, 862 (1975); *third*, that we have understood the right to require that the Government provide counsel for an indigent defendant accused of all but the least serious crimes, see *Gideon*, *supra*, at 344; and *fourth*, that we have considered the wrongful deprivation of the right to counsel a "structural" error that so "affec[ts] the framework within which the trial proceeds" that courts may not even ask whether the error harmed the defendant. *United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 148 (2006) (internal quotation marks omitted); see *id.*, at 150.

Given the necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of trust, neither is it surprising that the Court has held that the Sixth Amendment grants a defendant "a fair opportunity to secure counsel of his own choice." *Powell*, *supra*, at 53; see *Gonzalez-Lopez*, *supra*, at 150 (describing "these myriad aspects of representation"). This "fair opportunity" for the defendant to secure counsel of choice has limits. A defendant has no right, for example, to an attorney who is not a member of the bar, or who has a conflict of interest due to a relationship with an opposing party. See *Wheat* v. *United States*, 486 U. S. 153, 159 (1988). And an indigent defendant, while entitled to

adequate representation, has no right to have the Government pay for his preferred representational choice. See *Caplin & Drysdale*, 491 U. S., at 624.

We nonetheless emphasize that the constitutional right at issue here is fundamental: "[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Ibid.*

## B

The Government cannot, and does not, deny Luis' right to be represented by a qualified attorney whom she chooses and can afford. But the Government would undermine the value of that right by taking from Luis the ability to use the funds she needs to pay for her chosen attorney. The Government points out that, while freezing the funds may have this consequence, there are important interests on the other side of the legal equation: It wishes to guarantee that those funds will be available later to help pay for statutory penalties (including forfeiture of untainted assets) and restitution, should it secure convictions. And it points to two cases from this Court, *Caplin & Drysdale*, *supra*, at 619, and *Monsanto*, 491 U. S., at 615, which, in the Government's view, hold that the Sixth Amendment does not pose an obstacle to its doing so here. In our view, however, the nature of the assets at issue here differs from the assets at issue in those earlier cases. And that distinction makes a difference.

### 1

The relevant difference consists of the fact that the property here is untainted; *i.e.*, it belongs to the defendant, pure and simple. In this respect it differs from a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing, or concealing of a crime. The Government may well

be able to freeze, perhaps to seize, assets of the latter, "tainted" kind before trial. As a matter of property law the defendant's ownership interest is imperfect. The robber's loot belongs to the victim, not to the defendant. See *Telegraph Co.* v. *Davenport*, 97 U. S. 369, 372 (1878) ("The great principle that no one can be deprived of his property without his assent, except by the processes of the law, requires . . . that the property wrongfully transferred or stolen should be restored to its rightful owner"). The cocaine is contraband, long considered forfeitable to the Government wherever found. See, *e.g.*, 21 U. S. C. §881(a) ("[Controlled substances] shall be subject to forfeiture to the United States and no property right shall exist in them"); *Carroll* v. *United States*, 267 U. S. 132, 159 (1925) (describing the seizure of "contraband forfeitable property"). And title to property used to commit a crime (or otherwise "traceable" to a crime) often passes to the Government at the instant the crime is planned or committed. See, *e.g.*, §853(c) (providing that the Government's ownership interest in such property relates back to the time of the crime).

The property at issue here, however, is not loot, contraband, or otherwise "tainted." It belongs to the defendant. That fact undermines the Government's reliance upon precedent, for both *Caplin & Drysdale* and *Monsanto* relied critically upon the fact that the property at issue was "tainted," and that title to the property therefore had passed from the defendant to the Government before the court issued its order freezing (or otherwise disposing of) the assets.

In *Caplin & Drysdale*, the Court considered a post-conviction forfeiture that took from a convicted defendant funds he would have used to pay his lawyer. The Court held that the forfeiture was constitutional. In doing so, however, it emphasized that the forfeiture statute at issue provided that "'[a]ll right, title, and interest in property

[constituting or derived from any proceeds obtained from the crime] vests in the United States *upon the commission of the act* giving rise to [the] forfeiture.'" 491 U. S., at 625, n. 4 (quoting §853(c)) (emphasis added). It added that the law had "long-recognized" as "lawful" the "practice of vesting title to any forfeitable asset[s] in the United State[s] at the time of the crim[e]." *Id.*, at 627. It pointed out that the defendant did not "claim, as a general proposition, that the [vesting] provision is unconstitutional, or that Congress cannot, as a general matter, vest title to assets derived from the crime in the Government, as of the date of the criminal act in question." *Id.*, at 627–628. And, given the vesting language, the Court explained that the defendant "did not hold good title" to the property. *Id.*, at 627. The Court therefore concluded that "[t]here is no constitutional principle that gives one person [namely, the defendant] the right to give another's [namely, the Government's] property to a third party," namely, the lawyer. *Id.*, at 628.

In *Monsanto*, the Court considered a pretrial restraining order that prevented a not-yet-convicted defendant from using certain assets to pay for his lawyer. The defendant argued that, given this difference, *Caplin & Drysdale*'s conclusion should not apply. The Court noted, however, that the property at issue was forfeitable under the same statute that was at issue in *Caplin & Drysdale*. See *Monsanto*, *supra*, at 614. And, as in *Caplin & Drysdale*, the application of that statute to Monsanto's case concerned only the pretrial restraint of assets *that were traceable to the crime*, see 491 U. S., at 602–603; thus, the statute passed title to those funds at the time the crime was committed (*i.e.*, before the trial), see §853(c). The Court said that *Caplin & Drysdale* had already "weigh[ed] . . . th[e] very interests" at issue. *Monsanto*, *supra*, at 616. And it "rel[ied] on" its "conclusion" in *Caplin & Drysdale* to dispose of, and to reject, the defendant's "similar constitu-

tional claims."  491 U. S., at 614.

JUSTICE KENNEDY prefers to read *Caplin & Drysdale* and *Monsanto* broadly, as holding that "the Government, having established probable cause to believe that Luis' substitute [*i.e.*, innocent] assets will be forfeitable upon conviction, should be permitted to obtain a restraining order barring her from spending those funds prior to trial."  *Post*, at 6–7 (dissenting opinion).  In other words, he believes that those cases stand for the proposition that property—whether tainted or untainted—is subject to pretrial restraint, so long as the property might someday be subject to forfeiture.  But this reading asks too much of our precedents.  For one thing, as discussed, *Caplin & Drysdale* and *Monsanto* involved the restraint only of tainted assets, and thus we had no occasion to opine in those cases about the constitutionality of pretrial restraints of other, untainted assets.

For another thing, JUSTICE KENNEDY's broad rule ignores the statutory background against which *Caplin & Drysdale* and *Monsanto* were decided.  The Court in those cases referenced §853(c) more than a dozen times.  And it acknowledged that whether property is "forfeitable" or subject to pretrial restraint under Congress' scheme is a nuanced inquiry that very much depends on who has the superior interest in the property at issue.  See *Caplin & Drysdale*, *supra*, at 626–628; *Monsanto*, 491 U. S., at 616. We see this in, for example, §853(e)(1), which explicitly authorizes restraining orders or injunctions against "property described in subsection (a) of this section" (*i.e.*, *tainted* assets).  We see this too in §853(e)(1)(B), which requires the Government—in certain circumstances—to give "notice to persons appearing to have an interest in the property and opportunity for hearing" before obtaining a restraining order against such property.  We see this in §853(c), which allows "bona fide purchaser[s] for value" to keep property that would otherwise be subject to forfei-

ture. And we see this in §853(n)(6)(A), which exempts certain property from forfeiture when a third party can show a vested interest in the property that is "superior" to that of the Government.

The distinction that we have discussed is thus an important one, not a technicality. It is the difference between what is yours and what is mine. In *Caplin & Drysdale* and *Monsanto*, the Government wanted to impose restrictions upon (or seize) property that the Government had probable cause to believe was the proceeds of, or traceable to, a crime. See *Monsanto*, *supra*, at 615. The relevant statute said that the Government took title to those tainted assets as of the time of the crime. See §853(c). And the defendants in those cases consequently had to concede that the disputed property was in an important sense the Government's at the time the court imposed the restrictions. See *Caplin & Drysdale*, *supra*, at 619–620; *Monsanto*, *supra*, at 602–603.

This is not to say that the Government "owned" the tainted property outright (in the sense that it could take possession of the property even before obtaining a conviction). See *post*, at 7–10 (KENNEDY, J., dissenting). Rather, it is to say that the Government even before trial had a "substantial" interest in the tainted property sufficient to justify the property's pretrial restraint. See *Caplin & Drysdale*, *supra*, at 627 ("[T]he property rights given the Government by virtue of [§853(c)'s relation-back provision] are more substantial than petitioner acknowledges"); *United States* v. *Stowell*, 133 U. S. 1, 19 (1890) ("As soon as [the possessor of the forfeitable asset committed the violation] . . . , the forfeiture . . . *took effect*, and (though needing judicial condemnation to perfect it) operated *from that time* as a statutory conveyance to the United States of all right, title and interest then remaining in the [possessor]; and was as valid and effectual, against all the world, as a recorded deed" (emphasis added)).

If we analogize to bankruptcy law, the Government, by application of §853(c)'s relation-back provision, became something like a secured creditor with a lien on the defendant's tainted assets superior to that of most any other party. See 4 Collier on Bankruptcy ¶506.03[1] (16th ed. 2015). For this reason, §853(c) has operated in our cases as a significant limitation on criminal defendants' property rights in such assets—even before conviction. See *Monsanto, supra*, at 613 ("Permitting a defendant to use [tainted] assets for his private purposes that, under this [relation-back] provision, will become the property of the United States if a conviction occurs cannot be sanctioned"); cf. *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 326 (1999) (noting that the Court had previously authorized injunctions against the further dissipation of property where, among other things, "the creditor (the Government) asserted an equitable lien on the property").

Here, by contrast, the Government seeks to impose restrictions upon Luis' *un*tainted property without any showing of any equivalent governmental interest in that property. Again, if this were a bankruptcy case, the Government would be at most an unsecured creditor. Although such creditors someday might collect from a debtor's general assets, they cannot be said to have any present claim to, or interest in, the debtor's property. See *id.*, at 330 ("[B]efore judgment . . . an unsecured creditor has no rights at law or in equity in the property of his debtor"); see also 5 Collier on Bankruptcy ¶541.05[1][b] ("[G]eneral unsecured creditor[s]" have "no specific property interest in the goods held or sold by the debtor"). The competing property interests in the tainted- and untainted-asset contexts therefore are not "exactly the same." *Post*, at 2 (KAGAN, J., dissenting). At least regarding her untainted assets, Luis can at this point reasonably claim that the property is still "mine," free and clear.

2

This distinction between (1) what is primarily "mine" (the defendant's) and (2) what is primarily "yours" (the Government's) does not by itself answer the constitutional question posed, for the law of property sometimes allows a person without a present interest in a piece of property to impose restrictions upon a current owner, say, to prevent waste. A holder of a reversionary interest, for example, can prevent the owner of a life estate from wasting the property. See, *e.g.*, *Peterson* v. *Ferrell*, 127 N. C. 169, 170, 37 S. E. 189, 190 (1900). Those who later may become beneficiaries of a trust are sometimes able to prevent the trustee from dissipating the trust's assets. See, *e.g.*, *Kollock* v. *Webb*, 113 Ga. 762, 769, 39 S. E. 339, 343 (1901). And holders of a contingent, future executory interest in property (an interest that might become possessory at some point down the road) can, in limited circumstances, enjoin the activities of the current owner. See, *e.g.*, *Dees* v. *Cheuvronts*, 240 Ill. 486, 491, 88 N. E. 1011, 1012 (1909) ("[E]quity w[ill] interfere . . . only when it is made to appear that the contingency . . . is reasonably certain to happen, and the waste is . . . wanton and conscienceless"). The Government here seeks a somewhat analogous order, *i.e.*, an order that will preserve Luis' untainted assets so that they will be available to cover the costs of forfeiture and restitution if she is convicted, and if the court later determines that her tainted assets are insufficient or otherwise unavailable.

The Government finds statutory authority for its request in language authorizing a court to enjoin a criminal defendant from, for example, disposing of innocent "property of equivalent value" to that of tainted property. 18 U. S. C. §1345(a)(2)(B)(i). But Luis needs some portion of those same funds to pay for the lawyer of her choice. Thus, the legal conflict arises. And, in our view, insofar as innocent (*i.e.*, untainted) funds are needed to obtain coun-

sel of choice, we believe that the Sixth Amendment prohibits the court order that the Government seeks.

Three basic considerations lead us to this conclusion. First, the nature of the competing interests argues against this kind of court order. On the one side we find, as we have previously explained, *supra*, at 3–5, a Sixth Amendment right to assistance of counsel that is a fundamental constituent of due process of law, see *Powell*, 287 U. S., at 68–69. And that right includes "the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale*, 491 U. S., at 624. The order at issue in this case would seriously undermine that constitutional right.

On the other side we find interests that include the Government's contingent interest in securing its punishment of choice (namely, criminal forfeiture) as well as the victims' interest in securing restitution (notably, from funds belonging to the defendant, not the victims). While these interests are important, to deny the Government the order it requests will not inevitably undermine them, for, at least sometimes, the defendant may possess other assets—say, "tainted" property—that might be used for forfeitures and restitution. Cf. *Gonzalez-Lopez*, 548 U. S., at 148 ("Deprivation of the right" to counsel of the defendant's choice "is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants"). Nor do the interests in obtaining payment of a criminal forfeiture or restitution order enjoy constitutional protection. Rather, despite their importance, compared to the right to counsel of choice, these interests would seem to lie somewhat further from the heart of a fair, effective criminal justice system.

Second, relevant legal tradition offers virtually no significant support for the Government's position. Rather, tradition argues to the contrary. Describing the 18th-century English legal world (which recognized only a

limited right to counsel), Blackstone wrote that "only" those "goods and chattels" that "a man has *at the time of conviction* shall be forfeited." 4 W. Blackstone, Commentaries on the Laws of England 388 (1765) (emphasis added); see 1 J. Chitty, Practical Treatise on the Criminal Law 737 (1816) ("[T]he party indicted may sell any of [his property] . . . to assist him in preparing for his defense on the trial").

Describing the common law as understood in 19th-century America (which recognized a broader right to counsel), Justice Story wrote:

> "It is well known, that at the common law, in many cases of felonies, the party forfeited his goods and chattels to the crown. The forfeiture . . . was a part, or at least a consequence, of the judgment of conviction. It is plain from this statement, that no right to the goods and chattels of the felon could be acquired by the crown by the mere commission of the offense; but the right attached only by the conviction of the offender. . . . In the contemplation of the common law, the offender's right was not divested until the conviction." *The Palmyra*, 12 Wheat. 1, 14 (1827).

See generally *Powell*, *supra*, at 60–61 (describing the scope of the right to counsel in 18th-century Britain and colonial America).

As we have explained, *supra*, at 6–10, cases such as *Caplin & Drysdale* and *Monsanto* permit the Government to freeze a defendant's assets pretrial, but the opinions in those cases highlight the fact that the property at issue was "tainted," *i.e.*, it did not belong entirely to the defendant. We have found no decision of this Court authorizing unfettered, pretrial forfeiture of the defendant's own "innocent" property—property with no connection to the charged crime. Nor do we see any grounds for distinguishing the historic preference against preconviction *forfei-*

*tures* from the preconviction *restraint* at issue here. As far as Luis' Sixth Amendment right to counsel of choice is concerned, a restraining order might as well be a forfeiture; that is, the restraint itself suffices to completely deny this constitutional right. See *Gonzalez-Lopez, supra,* at 148.

Third, as a practical matter, to accept the Government's position could well erode the right to counsel to a considerably greater extent than we have so far indicated. To permit the Government to freeze Luis' untainted assets would unleash a principle of constitutional law that would have no obvious stopping place. The statutory provision before us authorizing the present restraining order refers only to "banking law violation[s]" and "Federal health care offense[s]." 18 U. S. C. §1345(a)(2). But, in the Government's view, Congress could write more statutes authorizing pretrial restraints in cases involving other illegal behavior—after all, a broad range of such behavior can lead to postconviction forfeiture of untainted assets. See, *e.g.,* §1963(m) (providing for forfeiture of innocent, substitute assets for any violation of the Racketeer Influenced and Corrupt Organizations Act).

Moreover, the financial consequences of a criminal conviction are steep. Even beyond the forfeiture itself, criminal fines can be high, and restitution orders expensive. See, *e.g.,* §1344 ($1 million fine for bank fraud); §3571 (mail and wire fraud fines of up to $250,000 for individuals and $500,000 for organizations); *United States* v. *Gushlak,* 728 F. 3d 184, 187, 203 (CA2 2013) ($17.5 million restitution award against an individual defendant in a fraud-on-the-market case); *FTC* v. *Trudeau,* 662 F. 3d 947, 949 (CA7 2011) ($37.6 million remedial sanction for fraud). How are defendants whose innocent assets are frozen in cases like these supposed to pay for a lawyer— particularly if they lack "tainted assets" because they are innocent, a class of defendants whom the right to counsel

certainly seeks to protect?  See *Powell*, 287 U. S., at 69; Amar, 84 Geo. L. J., at 643 ("[T]he Sixth Amendment is generally designed to elicit truth and protect innocence").

These defendants, rendered indigent, would fall back upon publicly paid counsel, including overworked and underpaid public defenders.  As the Department of Justice explains, only 27 percent of county-based public defender offices have sufficient attorneys to meet nationally recommended caseload standards.  Dept. of Justice, Bureau of Justice Statistics, D. Farole & L. Langton, Census of Public Defender Offices, 2007: County-based and Local Public Defender Offices, 2007, p. 10 (Sept. 2010).  And as one *amicus* points out, "[m]any federal public defender organizations and lawyers appointed under the Criminal Justice Act serve numerous clients and have only limited resources."  Brief for New York Council of Defense Lawyers 11.  The upshot is a substantial risk that accepting the Government's views would—by increasing the government-paid-defender workload—render less effective the basic right the Sixth Amendment seeks to protect.

3

We add that the constitutional line we have drawn should prove workable.  That line distinguishes between a criminal defendant's (1) tainted funds and (2) innocent funds needed to pay for counsel.  We concede, as JUSTICE KENNEDY points out, *post*, at 12–13, that money is fungible; and sometimes it will be difficult to say whether a particular bank account contains tainted or untainted funds.  But the law has tracing rules that help courts implement the kind of distinction we require in this case.  With the help of those rules, the victim of a robbery, for example, will likely obtain the car that the robber used stolen money to buy.  See, *e.g.*, 1 G. Palmer, Law of Restitution §2.14, p. 175 (1978) ("tracing" permits a claim against "an asset which is traceable to or the product of"

tainted funds); 4 A. Scott, Law of Trusts §518, pp. 3309–3314 (1956) (describing the tracing rules governing commingled accounts). And those rules will likely also prevent Luis from benefiting from many of the money transfers and purchases JUSTICE KENNEDY describes. See *post*, at 12–13.

Courts use tracing rules in cases involving fraud, pension rights, bankruptcy, trusts, etc. See, *e.g.*, *Montanile* v. *Board of Trustees of Nat. Elevator Industry Health Benefit Plan*, 577 U. S. ___, ___–___ (2016) (slip op., at 8–9). They consequently have experience separating tainted assets from untainted assets, just as they have experience determining how much money is needed to cover the costs of a lawyer. See, *e.g.*, 18 U. S. C. §1345(b) ("The court shall proceed as soon as practicable to the hearing and determination of [actions to freeze a defendant's tainted or untainted assets]"); 28 U. S. C. §2412(d) (courts must determine reasonable attorneys' fees under the Equal Access to Justice Act); see also *Kaley*, 571 U. S., at ___, and n. 3 (slip op., at 3, and n. 3) ("Since *Monsanto*, the lower courts have generally provided a hearing. . . . [to determine] whether probable cause exists to believe that the assets in dispute are traceable . . . to the crime charged in the indictment"). We therefore see little reason to worry, as JUSTICE KENNEDY seems to, that defendants will "be allowed to circumvent [the usual forfeiture rules] by using . . . funds to pay for a high, or even the highest, priced defense team [they] can find." *Post*, at 7.

*          *          *

For the reasons stated, we conclude that the defendant in this case has a Sixth Amendment right to use her own "innocent" property to pay a reasonable fee for the assistance of counsel. On the assumptions made here, the District Court's order prevents Luis from exercising that right. We consequently vacate the judgment of the Court of Appeals and remand the case for further proceedings.

*It is so ordered.*

APPENDIX

Title 18 U. S. C. §1345 provides:

"(a)(1) If a person is—

   "(A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title;

   "(B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title); or

   "(C) committing or about to commit a Federal health care offense;

"the Attorney General may commence a civil action in any Federal court to enjoin such violation.

"(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title) or a Federal health care offense or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—

   "(A) to enjoin such alienation or disposition of property; or

   "(B) for a restraining order to—

      "(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

      "(ii) appoint a temporary receiver to administer such restraining order.

"(3) A permanent or temporary injunction or restraining order shall be granted without bond.

"(b) The court shall proceed as soon as practicable to the

hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure."

# SUPREME COURT OF THE UNITED STATES

———————

No. 14–419

———————

## SILA LUIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[March 30, 2016]

JUSTICE THOMAS, concurring in the judgment.

I agree with the plurality that a pretrial freeze of un-
tainted assets violates a criminal defendant's Sixth
Amendment right to counsel of choice. But I do not agree
with the plurality's balancing approach. Rather, my
reasoning rests strictly on the Sixth Amendment's text
and common-law backdrop.

The Sixth Amendment provides important limits on the
Government's power to freeze a criminal defendant's
forfeitable assets before trial. And, constitutional rights
necessarily protect the prerequisites for their exercise.
The right "to have the Assistance of Counsel," U. S. Const.,
Amdt. 6, thus implies the right to use lawfully owned
property to pay for an attorney. Otherwise the right to
counsel—originally understood to protect only the right to
hire counsel of choice—would be meaningless. History
confirms this textual understanding. The common law
limited pretrial asset restraints to tainted assets. Both
this textual understanding and history establish that the
Sixth Amendment prevents the Government from freezing
untainted assets in order to secure a potential forfeiture.
The freeze here accordingly violates the Constitution.

## I

The Sixth Amendment provides, "In all criminal prose-
cutions, the accused shall enjoy the right . . . to have the

Assistance of Counsel for his defence." As originally un-
derstood, this right guaranteed a defendant the right "to
employ a lawyer to assist in his defense." *Scott* v. *Illinois*,
440 U. S. 367, 370 (1979). The common law permitted
counsel to represent defendants charged with misdemean-
ors, but not felonies other than treason. W. Beaney, The
Right to Counsel in American Courts 8–9 (1955). The
Sixth Amendment abolished the rule prohibiting represen-
tation in felony cases, but was "not aimed to compel the
State to provide counsel for a defendant." *Betts* v. *Brady*,
316 U. S. 455, 466 (1942), overruled by *Gideon* v. *Wain-
wright*, 372 U. S. 335 (1963); see Beaney, *supra,* at 27–36.
"The right to select counsel of one's choice" is thus "the
root meaning" of the Sixth Amendment right to counsel.
*United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 147–148
(2006).

  The Sixth Amendment denies the Government un-
checked power to freeze a defendant's assets before trial
simply to secure potential forfeiture upon conviction. If
that bare expectancy of criminal punishment gave the
Government such power, then a defendant's right to coun-
sel of choice would be meaningless, because retaining an
attorney requires resources. The law has long recognized
that the "[a]uthorization of an act also authorizes a neces-
sary predicate act." A. Scalia & B. Garner, Reading Law:
The Interpretation of Legal Texts 192 (2012) (discussing
the "predicate-act canon"). As Thomas Cooley put it with
respect to Government powers, "where a general power is
conferred or duty enjoined, every particular power neces-
sary for the exercise of the one, or the performance of the
other, is also conferred." Constitutional Limitations 63
(1868); see 1 J. Kent, Commentaries on American Law 464
(13th ed. 1884) ("[W]henever a power is given by a statute,
everything necessary to the making of it effectual or req-
uisite to attain the end is implied"). This logic equally
applies to individual rights. After all, many rights are

powers reserved to the People rather than delegated to the Government. Cf. U. S. Const., Amdt. 10 ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people").

Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. "There comes a point . . . at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Hill* v. *Colorado*, 530 U. S. 703, 745 (2000) (Scalia, J., dissenting). The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," *Jackson* v. *City and County of San Francisco*, 746 F. 3d 953, 967 (CA9 2014) (internal quotation marks omitted), and "to acquire and maintain proficiency in their use," *Ezell* v. *Chicago*, 651 F. 3d 684, 704 (CA7 2011). See *District of Columbia* v. *Heller*, 554 U. S. 570, 617–618 (2008) (citing T. Cooley, General Principles of Constitutional Law 271 (2d ed. 1891) (discussing the implicit right to train with weapons)); *United States* v. *Miller*, 307 U. S. 174, 180 (1939) (citing 1 H. Osgood, The American Colonies in the 17th Century 499 (1904) (discussing the implicit right to possess ammunition)); *Andrews* v. *State*, 50 Tenn. 165, 178 (1871) (discussing both rights). Without protection for these closely related rights, the Second Amendment would be toothless. Likewise, the First Amendment "right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise." *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 252 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part).

The same goes for the Sixth Amendment and the financial resources required to obtain a lawyer. Without constitutional protection for at least *some* of a defendant's assets, the Government could nullify the right to counsel of

choice.  As the plurality says, an unlimited power to freeze
assets before trial "would unleash a principle of constitu-
tional law that would have no obvious stopping place."
*Ante*, at 14; cf. *McCulloch* v. *Maryland*, 4 Wheat. 316, 431
(1819) ("[T]he power to tax involves the power to destroy"
and that "power to destroy may defeat and render useless
the power to create").  Unless the right to counsel also
protects the prerequisite right to use one's financial re-
sources for an attorney, I doubt that the Framers would
have gone through the trouble of adopting such a flimsy
"parchment barrie[r]."  The Federalist No. 48, p. 308 (C.
Rossiter ed. 1961) (J. Madison).

   An unlimited power to freeze a defendant's potentially
forfeitable assets in advance of trial would eviscerate the
Sixth Amendment's original meaning and purpose.  At
English common law, forfeiture of all real and personal
property was a standard punishment for felonies.  See 4
W. Blackstone, Commentaries on the Laws of England 95
(1769) (Blackstone).  That harsh penalty never caught on
in America.  See *Calero-Toledo* v. *Pearson Yacht Leasing
Co.*, 416 U. S. 663, 682–683 (1974).  The First Congress
banned it.  See Crimes Act of 1790, §24, 1 Stat. 117 ("[N]o
conviction or judgment for any of the offences aforesaid,
shall work corruption of blood, or any forfeiture of estate").
But the Constitution did not.  See Art. III, §3, cl. 2 ("[N]o
Attainder of Treason shall work Corruption of Blood, or
Forfeiture except during the Life of the Person attainted").
If the Government's mere expectancy of a total forfeiture
upon conviction were sufficient to justify a complete pre-
trial asset freeze, then Congress could render the right to
counsel a nullity in felony cases.  That would have shocked
the Framers.  As discussed, before adoption of the Sixth
Amendment, felony cases (not misdemeanors) were *pre-
cisely* when the common law denied defendants the right
to counsel.  See *supra,* at ___.  With an unlimited power to
freeze assets before trial, the Government could well

revive the common-law felony rule that the Sixth Amendment was designed to abolish.

The modern, judicially created right to Government-appointed counsel does not obviate these concerns. As understood in 1791, the Sixth Amendment protected a defendant's right to retain an attorney he could afford. It is thus no answer, as the principal dissent replies, that defendants rendered indigent by a pretrial asset freeze can resort to public defenders. *Post*, at 14 (opinion of KENNEDY, J.). The dissent's approach nullifies the *original understanding* of the right to counsel. To ensure that the right to counsel has meaning, the Sixth Amendment limits the assets the Government may freeze before trial to secure eventual forfeiture.

## II

The longstanding rule against restraining a criminal defendant's untainted property before conviction guarantees a meaningful right to counsel. The common-law forfeiture tradition provides the limits of this Sixth Amendment guarantee. That tradition draws a clear line between tainted and untainted assets. The only alternative to this common-law reading is case-by-case adjudication to determine which freezes are "legitimate" and which are an "abuse of . . . power." *McCulloch*, 4 Wheat., at 430. This piecemeal approach seems woefully inadequate. Such questions of degree are "unfit for the judicial department." *Ibid.* But see *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 635 (1989) (stating in dicta that "[c]ases involving particular abuses can be dealt with individually . . . when (and if) any such cases arise"). Fortunately the common law drew a clear line between tainted and untainted assets.

Pretrial freezes of untainted forfeitable assets did not emerge until the late 20th century. "'[T]he lack of historical precedent'" for the asset freeze here is "'[p]erhaps the

most telling indication of a severe constitutional problem.'" *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 505–506 (2010) (quoting *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.,* 537 F. 3d 667, 699 (CADC 2008) (Kavanaugh, J., dissenting)). Indeed, blanket asset freezes are so tempting that the Government's "prolonged reticence would be amazing if [they] were not understood to be constitutionally proscribed." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 230 (1995); see *Printz* v. *United States*, 521 U. S. 898, 907–908 (1997) (reasoning that the lack of early federal statutes commandeering state executive officers "suggests an assumed *absence* of such power" given "the attractiveness of that course to Congress").

The common law prohibited pretrial freezes of criminal defendants' untainted assets. As the plurality notes, *ante*, at 13, for *in personam* criminal forfeitures like that at issue here, any interference with a defendant's property traditionally required a conviction. Forfeiture was "a part, or at least a consequence, of the judgment of conviction." *The Palmyra*, 12 Wheat. 1, 14 (1827) (Story, J.). The defendant's "property cannot be touched before . . . the forfeiture is completed." 1 J. Chitty, A Practical Treatise on the Criminal Law 737 (5th ed. 1847). This rule applied equally "to money as well as specific chattels." *Id.,* at 736. And it was not limited to full-blown physical seizures. Although the defendant's goods could be appraised and inventoried before trial, he remained free to "sell any of them for his own support in prison, or that of his family, *or to assist him in preparing for his defence on the trial*." *Id.*, at 737 (emphasis added). Blackstone likewise agreed that a defendant "may *bona fide* sell any of his chattels, real or personal, for the sustenance of himself and family between the [offense] and conviction." 4 Blackstone 380; see *Fleetwood's Case*, 8 Co. Rep. 171a, 171b, 77 Eng. Rep. 731, 732 (K. B. 1611) (endorsing this rule). At most, a court could

unwind prejudgment fraudulent transfers after conviction. 4 Blackstone 381; see *Jones* v. *Ashurt*, Skin. 357, 357–358, 90 Eng. Rep. 159 (K. B. 1693) (unwinding a fraudulent sale after conviction because it was designed to defeat forfeiture). Numerous English authorities confirm these common-law principles. Chitty, *supra,* at 736–737 (collecting sources).

The common law did permit the Government, however, to seize tainted assets before trial. For example, "seizure of the *res* has long been considered a *prerequisite* to the initiation of *in rem* forfeiture proceedings." *United States* v. *James Daniel Good Real Property*, 510 U. S. 43, 57 (1993) (emphasis added); see *The Brig Ann*, 9 Cranch 289, 291 (1815) (Story, J.). But such forfeitures were traditionally "fixed . . . by determining what property has been 'tainted' by unlawful use." *Austin* v. *United States*, 509 U. S. 602, 627 (1993) (Scalia, J., concurring in part and concurring in judgment). So the civil *in rem* forfeiture tradition tracks the tainted-untainted line. It provides no support for the asset freeze here.

There is a similarly well-established Fourth Amendment tradition of seizing contraband and stolen goods before trial based only on probable cause. See *Carroll* v. *United States*, 267 U. S. 132, 149–152 (1925) (discussing this history); *Boyd* v. *United States*, 116 U. S. 616, 623–624 (1886) (same). Tainted assets fall within this tradition because they are the fruits or instrumentalities of crime. So the Government may freeze tainted assets before trial based on probable cause to believe that they are forfeitable. See *United States* v. *Monsanto*, 491 U. S. 600, 602–603, 615–616 (1989). Nevertheless, our precedents require "a nexus . . . between the item to be seized and criminal behavior." *Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 307 (1967). Untainted assets almost never have such a nexus. The only exception is that some property that is evidence of crime might techni-

cally qualify as "untainted" but nevertheless has a nexus to criminal behavior. See *ibid.* Thus, untainted assets do not fall within the Fourth Amendment tradition either.

It is certainly the case that some early American statutes did provide for civil forfeiture of untainted substitute property. See Registry Act, §12, 1 Stat. 293 (providing for forfeiture of a ship or "the value thereof"); Collection Act of July 31, 1789, §22, 1 Stat. 42 (similar for goods); *United States* v. *Bajakajian*, 524 U. S. 321, 341 (1998) (collecting statutes). These statutes grew out of a broader "six-century-long tradition of *in personam* customs fines equal to one, two, three, or even four times the value of the goods at issue." *Id.*, at 345–346 (KENNEDY, J., dissenting).

But this long tradition of *in personam* customs fines does not contradict the general rule against *pretrial* seizures of untainted property. These fines' *in personam* status strongly suggests that the Government did not collect them by seizing property at the outset of litigation. As described, that process was traditionally required for *in rem* forfeiture of tainted assets. See *supra,* at ___. There appears to be scant historical evidence, however, that forfeiture ever involved seizure of untainted assets before trial and judgment, except in limited circumstances not relevant here. Such summary procedures were reserved for collecting taxes and seizures during war. See *Phillips* v. *Commissioner*, 283 U. S. 589, 595 (1931); *Miller* v. *United States*, 11 Wall. 268, 304–306 (1871). The Government's right of action in tax and custom-fine cases may have been the same—"a civil action of debt." *Bajakajian*, *supra*, at 343, n. 18; *Stockwell* v. *United States*, 13 Wall. 531, 543 (1871); *Adams* v. *Woods*, 2 Cranch 336, 341 (1805). Even so, nothing suggests trial and judgment were expendable. See *Miller*, *supra*, at 304–305 (stating in dicta that confiscating Confederate property through *in rem* proceedings would have raised Fifth and Sixth Amendment concerns had they not been a war measure).

The common law thus offers an administrable line: A criminal defendant's untainted assets are protected from Government interference before trial and judgment. His tainted assets, by contrast, may be seized before trial as contraband or through a separate *in rem* proceeding. Reading the Sixth Amendment to track the historical line between tainted and untainted assets makes good sense. It avoids case-by-case adjudication, and ensures that the original meaning of the right to counsel does real work. The asset freeze here infringes the right to counsel because it "is so broad that it differs not only in degree, but in kind, from its historical antecedents." *James Daniel Good, supra,* at 82 (THOMAS, J., concurring in part and dissenting in part).

The dissenters object that, before trial, a defendant has an identical property interest in tainted and untainted assets. See *post*, at 8–9 (opinion of KENNEDY, J.); *post*, at 2 (opinion of KAGAN, J.). Perhaps so. I need not take a position on the matter. Either way, that fact is irrelevant. Because the pretrial asset freeze here crosses into untainted assets, for which there is no historical tradition, it is unconstitutional. Any such incursion violates the Sixth Amendment.

## III

Since the asset freeze here violates the Sixth Amendment, the plurality correctly concludes that the judgment below must be reversed. But I cannot go further and endorse the plurality's atextual balancing analysis. The Sixth Amendment guarantees the right to counsel of choice. As discussed, a pretrial freeze of untainted assets infringes that right. This conclusion leaves no room for balancing. Moreover, I have no idea whether, "compared to the right to counsel of choice," the Government's interests in securing forfeiture and restitution lie "further from the heart of a fair, effective criminal justice system." *Ante,*

at 12. Judges are not well suited to strike the right "bal-ance" between those incommensurable interests. Nor do I think it is our role to do so. The People, through ratifica-tion, have already weighed the policy tradeoffs that consti-tutional rights entail. See *Heller*, 554 U. S., at 634–635. Those tradeoffs are thus not for us to reevaluate. "The very enumeration of the right" to counsel of choice denies us "the power to decide . . . whether the right is *really worth* insisting upon." *Id.*, at 634. Such judicial balancing "do[es] violence" to the constitutional design. *Crawford* v. *Washington*, 541 U. S. 36, 67–68 (2004). And it is out of step with our interpretive tradition. See Aleinikoff, Con-stitutional Law in the Age of Balancing, 96 Yale L. J. 943, 949–952 (1987) (noting that balancing did not appear in the Court's constitutional analysis until the mid-20th century).

The plurality's balancing analysis also casts doubt on the constitutionality of incidental burdens on the right to counsel. For the most part, the Court's precedents hold that a generally applicable law placing only an incidental burden on a constitutional right does not violate that right. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 389–390 (1992) (explaining that content-neutral laws do not violate the First Amendment simply because they incidentally burden expressive conduct); *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 878–882 (1990) (likewise for religion-neutral laws that burden religious exercise).

Criminal-procedure rights tend to follow the normal incidental-burden rule. The Constitution does not "forbi[d] every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights." *Chaffin* v. *Stynchcombe*, 412 U. S. 17, 30 (1973). The threat of more severe charges if a defendant refuses to plead guilty does not violate his right to trial. See *Bordenkircher* v. *Hayes*, 434 U. S. 357, 365

(1978). And, in my view, prosecutorial arguments that raise the "cost" of remaining silent do not violate a defendant's right against self-incrimination (at least as a matter of original meaning). See *Mitchell* v. *United States*, 526 U. S. 314, 342–343 (1999) (THOMAS, J., dissenting); *id.,* at 331–336 (Scalia, J., dissenting).

The Sixth Amendment arguably works the same way. "[A] defendant may not insist on representation by an attorney he cannot afford." *Wheat* v. *United States*, 486 U. S. 153, 159 (1988). The Constitution perhaps guarantees only a "freedom of counsel" akin to the First Amendment freedoms of speech and religion that also "depen[d] in part on one's financial wherewithal." *Caplin & Drysdale*, 491 U. S., at 628. Numerous laws make it more difficult for defendants to retain a lawyer. But that fact alone does not create a Sixth Amendment problem. For instance, criminal defendants must still pay taxes even though "these financial levies may deprive them of resources that could be used to hire an attorney." *Id.,* at 631–632. So I lean toward the principal dissent's view that incidental burdens on the right to counsel of choice would not violate the Sixth Amendment. See *post*, at 5–6, 11–12 (opinion of KENNEDY, J.).

On the other hand, the Court has said that the right to counsel guarantees defendants "a *fair opportunity* to secure counsel of [their] choice." *Powell* v. *Alabama*, 287 U. S. 45, 52–53 (1932) (emphasis added). The state court in *Powell* denied the defendants such an opportunity, the Court held, by moving to trial so quickly (six days after indictment) that the defendants had no chance to communicate with family or otherwise arrange for representation. *Ibid.* The schedule in *Powell* was not designed to block counsel, which suggests the usual incidental-burden rule might be inapt in the Sixth Amendment context. I leave the question open because this case does not require an answer.

   The asset freeze here is not merely an incidental burden on the right to counsel of choice; it targets a defendant's assets, which are necessary to exercise that right, simply to secure forfeiture upon conviction. The prospect of that criminal punishment, however, is precisely why the Constitution guarantees a right to counsel. The Sixth Amendment does not permit the Government's bare expectancy of forfeiture to void that right. When the potential of a conviction is the only basis for interfering with a defendant's assets before trial, the Constitution requires the Government to respect the longstanding common-law protection for a defendant's untainted property.

   For these reasons, I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

———

No. 14–419

———

## SILA LUIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[March 30, 2016]

JUSTICE KENNEDY, with whom JUSTICE ALITO joins,
dissenting.

The plurality and JUSTICE THOMAS find in the Sixth
Amendment a right of criminal defendants to pay for an
attorney with funds that are forfeitable upon conviction so
long as those funds are not derived from the crime alleged.
That unprecedented holding rewards criminals who hurry
to spend, conceal, or launder stolen property by assuring
them that they may use their own funds to pay for an
attorney after they have dissipated the proceeds of their
crime. It matters not, under today's ruling, that the de-
fendant's remaining assets must be preserved if the victim
or the Government is to recover for the property wrong-
fully taken. By granting a defendant a constitutional
right to hire an attorney with assets needed to make a
property-crime victim whole, the plurality and JUSTICE
THOMAS ignore this Court's precedents and distort the
Sixth Amendment right to counsel.

The result reached today makes little sense in cases
that involve fungible assets preceded by fraud, embezzle-
ment, or other theft. An example illustrates the point.
Assume a thief steals $1 million and then wins another $1
million in a lottery. After putting the sums in separate
accounts, he or she spends $1 million. If the thief spends
his or her lottery winnings, the Government can restrain
the stolen funds in their entirety. The thief has no right to

use those funds to pay for an attorney. Yet if the thief heeds today's decision, he or she will spend the stolen money first; for if the thief is apprehended, the $1 million won in the lottery can be used for an attorney. This result is not required by the Constitution.

The plurality reaches its conclusion by weighing a defendant's Sixth Amendment right to counsel of choice against the Government's interest in preventing the dissipation of assets forfeitable upon conviction. In so doing, it—like JUSTICE THOMAS—sweeps aside the decisions in *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617 (1989), and *United States* v. *Monsanto*, 491 U. S. 600 (1989), both of which make clear that a defendant has no Sixth Amendment right to spend forfeitable assets (or assets that will be forfeitable) on an attorney. The principle the Court adopted in those cases applies with equal force here. Rather than apply that principle, however, the plurality and concurrence adopt a rule found nowhere in the Constitution or this Court's precedents—that the Sixth Amendment protects a person's right to spend otherwise forfeitable assets on an attorney so long as those assets are not related to or the direct proceeds of the charged crime. *Ante,* at 1 (plurality opinion); *ante,* at 1 (THOMAS, J., concurring in judgment). The reasoning in these separate opinions is incorrect, and requires this respectful dissent.

I

This case arises from petitioner Sila Luis' indictment for conspiring to commit health care fraud against the United States. The Government alleges that, as part of her illegal scheme, Luis used her health care companies to defraud Medicare by billing for services that were not medically necessary or actually provided. The charged crimes, the Government maintains, resulted in the payment of $45 million in improper Medicare benefits to Luis' companies.

The same day Luis was indicted, the Government initiated a civil action under 18 U. S. C. §1345 to restrain Luis' assets before her criminal trial, including substitute property of an amount equivalent to the value of the proceeds of her alleged crimes. To establish its entitlement to a restraining order, the Government showed that Luis and her co-conspirators were dissipating the illegally obtained assets. In particular, they were transferring money involved in the scheme to various individuals and entities, including shell corporations owned by Luis' family members. As part of this process, Luis opened and closed well over 40 bank accounts and withdrew large amounts of cash to hide the conspiracy's proceeds. Luis personally received almost $4.5 million in funds and used at least some of that money to purchase luxury items, real estate, and automobiles, and to travel. Based on this and other evidence, the District Court entered an order prohibiting Luis from spending up to $45 million of her assets.

Before the Court of Appeals for the Eleventh Circuit, Luis argued that the Sixth Amendment required that she be allowed to spend the restrained substitute assets on an attorney. The Court of Appeals disagreed, concluding that "[t]he arguments made by Luis . . . are foreclosed by the United States Supreme Court decisions in . . . *Caplin & Drysdale* [and] *Monsanto*." 564 Fed. Appx. 493, 494 (2014) (*per curiam*). In my view the Court of Appeals was correct, and its judgment should be affirmed.

## II
### A

In *Caplin & Drysdale*, a law firm had represented a defendant charged with running a massive drug-distribution scheme. The defendant pleaded guilty and agreed to forfeit his assets. The law firm then sought to recover a portion of the forfeited assets for its legal fees. The firm argued that, when a defendant needs forfeitable

assets to pay for an attorney, the forfeiture of those assets violates the defendant's Sixth Amendment right to be represented by his counsel of choice.

The Court rejected the firm's argument. The Sixth Amendment, the Court explained, "guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale*, 491 U. S., at 624. As for the right to choose one's own attorney, the Court observed that "nothing in [the forfeiture statute] prevents a defendant from hiring the attorney of his choice, or disqualifies any attorney from serving as a defendant's counsel." *Id.*, at 625. Even defendants who possess "nothing but assets the Government seeks to have forfeited . . . may be able to find lawyers willing to represent them, hoping that their fees will be paid in the event of acquittal, or via some other means that a defendant might come by in the future." *Ibid.* The burden imposed by forfeiture law, the Court concluded, is thus "a limited one." *Ibid.*

*Caplin & Drysdale* also repudiated the firm's contention that the Government has only a modest interest in forfeitable assets that may be used to retain an attorney. In light of the importance of separating criminals from their ill-gotten gains and providing restitution to victims of crime, the Court found "a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Id.*, at 631.

The same day the Court decided *Caplin & Drysdale* it decided *Monsanto*, which addressed the pretrial restraint of a defendant's assets "where the defendant seeks to use those assets to pay an attorney." 491 U. S., at 602. The Court rejected the notion that there is a meaningful dis-

tinction, for Sixth Amendment purposes, between the restraint of assets before trial and the forfeiture of assets after trial: "[I]f the Government may, post-trial, forbid the use of forfeited assets to pay an attorney, then surely no constitutional violation occurs when, after probable cause is adequately established, the Government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial." *Id.*, at 616. The Court noted, moreover, that "it would be odd to conclude that the Government may not restrain property . . . in [a defendant's] possession, based on a finding of probable cause, when we have held that (under appropriate circumstances), the Government may restrain *persons* where there is a finding of probable cause." *Id.*, at 615–616. When a defendant himself can be restrained pretrial, there is "no constitutional infirmity" in a similar pretrial restraint of a defendant's property "to protect its 'appearance' at trial and protect the community's interest in full recovery of any ill-gotten gains." *Id.,* at 616.

B

The principle the Court announced in *Caplin & Drysdale* and *Monsanto* controls the result here. Those cases establish that a pretrial restraint of assets forfeitable upon conviction does not contravene the Sixth Amendment even when the defendant possesses no other funds with which to pay for an attorney. The restraint itself does not prevent a defendant from seeking to convince his or her counsel of choice to take on the representation without advance payment. See *Caplin & Drysdale*, 491 U. S*.,* at 625. It does not disqualify any attorney the defendant might want. *Ibid.* And it does not prevent a defendant from borrowing funds to pay for an attorney who is otherwise too expensive. To be sure, a pretrial restraint may make it difficult for a defendant to secure counsel who insists that high defense costs be paid in advance. That

difficulty, however, does not result in a Sixth Amendment violation any more than high taxes or other government exactions that impose a similar burden. See, *e.g., id.*, at 631–632 ("Criminal defendants . . . are not exempted from federal, state, and local taxation simply because these financial levies may deprive them of resources that could be used to hire an attorney").

The pretrial restraint in *Monsanto* was no more burdensome than the pretrial restraint at issue here. Luis, like the defendant in *Monsanto*, was not barred from obtaining the assistance of any particular attorney. She was free to seek lawyers willing to represent her in the hopes that their fees would be paid at some future point. In short, §1345's authorization of a pretrial restraint of substitute assets places no greater burden on a defendant like Luis than the forfeiture and pretrial restraint statute placed on the defendant in *Monsanto*.

In addition, the Government has the same "strong . . . interest in obtaining full recovery of all forfeitable assets" here as it did in *Caplin & Drysdale* and *Monsanto*. See *Caplin & Drysdale, supra,* at 631. If Luis is convicted, the Government has a right to recover Luis' substitute assets—the money she kept for herself while spending the taxpayer dollars she is accused of stealing. Just as the Government has an interest in ensuring Luis' presence at trial—an interest that can justify a defendant's pretrial detention—so too does the Government have an interest in ensuring the availability of her substitute assets after trial, an interest that can justify pretrial restraint.

One need look no further than the Court's concluding words in *Monsanto* to know the proper result here: "[N]o constitutional violation occurs when, after probable cause [to believe that a defendant's assets will be forfeitable] is adequately established, the Government obtains an order barring a defendant from . . . dissipating his assets prior to trial." 491 U. S., at 616. The Government, having estab-

lished probable cause to believe that Luis' substitute assets will be forfeitable upon conviction, should be permitted to obtain a restraining order barring her from spending those funds prior to trial. Luis should not be allowed to circumvent that restraint by using the funds to pay for a high, or even the highest, priced defense team she can find.

## III

The plurality maintains that *Caplin & Drysdale* and *Monsanto* do not apply because "the nature of the assets at issue here differs from the assets at issue in those earlier cases." *Ante,* at 5. According to the plurality, the property here "belongs to the defendant, pure and simple." *Ibid.* It states that, while "title to property used to commit a crime . . . often passes to the Government at the instant the crime is planned or committed," title to Luis' untainted property has not passed to the Government. *Ante,* at 6. "That fact," the plurality concludes, "undermines the Government's reliance upon precedent, for both *Caplin & Drysdale* and *Monsanto* relied critically upon the fact that the property at issue was 'tainted,' and that title to the property therefore had passed from the defendant to the Government before the court issued its order freezing (or otherwise disposing of) the assets." *Ibid.*

These conclusions depend upon a key premise: The Government owns tainted assets before a defendant is convicted. That premise is quite incorrect, for the common law and this Court's precedents establish that the opposite is true. The Government does not own property subject to forfeiture, whether tainted or untainted, until the Government wins a judgment of forfeiture or the defendant is convicted. As Blackstone noted with emphasis, "goods and chattels are forfeited by *conviction.*" 4 W. Blackstone, Commentaries on the Laws of England 380 (1769) (Blackstone). Justice Story likewise observed that "no right to

the goods and chattels of the felon could be acquired by the crown by the mere commission of the offence; but the right attached only by the conviction of the offender." *The Palmyra*, 12 Wheat. 1, 14 (1827); *ibid.* ("In the contemplation of the common law, the offender's right was not devested until the conviction").

These authorities demonstrate that *Caplin & Drysdale* and *Monsanto* cannot be distinguished based on "the nature of the assets at issue." Title to the assets in those cases did not pass from the defendant to the Government until conviction. As a result, the assets restrained before conviction in *Monsanto* were on the same footing as the assets restrained here: There was probable cause to believe that the assets would belong to the Government upon conviction. But when the court issued its restraining order, they did not. The Government had no greater ownership interest in Monsanto's tainted assets than it has in Luis' substitute assets.

The plurality seeks to avoid this conclusion by relying on the relation-back doctrine. In its view the doctrine gives the Government title to tainted assets upon the commission of a crime rather than upon conviction or judgment of forfeiture. Even assuming, as this reasoning does, that the relation-back doctrine applies only to tainted assets—but see *United States* v. *McHan*, 345 F. 3d 262, 270–272 (CA4 2003)—the doctrine does not do the work the plurality's analysis requires.

The relation-back doctrine, which is incorporated in some forfeiture statutes, see, *e.g.*, 21 U. S. C. §853(c), has its origins in the common law. Under this legal construct, the Government's title to certain types of forfeitable property relates back to the time at which the defendant committed the crime giving rise to the forfeiture. See 4 Blackstone 375 ("forfeiture [of real estates] relates backwards to the time of the treason committed; so as to avoid all intermediate sales and incumbrances"); *United States* v.

*Parcel of Rumson, N. J., Land*, 507 U. S. 111, 125 (1993) (plurality opinion). The doctrine's purpose is to prevent defendants from avoiding forfeiture by transferring their property to third parties. The doctrine, however, does not alter the time at which title to forfeitable property passes to the Government. Title is transferred only when a conviction is obtained or the assets are otherwise forfeited; it is only once this precondition is met that relation back to the time of the offense is permitted. See *ibid.* (The relation-back doctrine's "fictional and retroactive vesting" is "not self-executing"); *id.*, at 132 (Scalia, J., concurring in judgment) ("The relation-back rule applies only in cases where the Government's title has been consummated by seizure, suit, and judgment, or decree of condemnation, whereupon the doctrine of relation *carries back* the title to the commission of the offense" (internal quotation marks, brackets, and citations omitted)); *United States* v. *Grundy*, 3 Cranch 337, 350–351 (1806) (Marshall, C. J., opinion for the Court) (a forfeitable asset does not "ves[t] in the government until some legal step shall be taken for the assertion of its right"); 4 Blackstone 375 ("But, though after attainder the forfeiture relates back to the time of the treason committed, yet it does not take effect unless an attainder be had"). In short, forfeitable property does not belong to the Government in any sense before judgment or conviction. Cf. *ante,* at 9 (plurality opinion). Until the Government wins a judgment or conviction, "someone else owns the property." *Parcel of Rumson, supra*, at 127.

The plurality is correct to note that *Caplin & Drysdale* discussed the relation-back provision in the forfeiture statute at issue. The *Caplin & Drysdale* Court did not do so, however, to suggest that forfeitable assets can be restrained only when the assets are tainted. Rather, the Court referred to the provision to rebut the law firm's argument that the United States has less of an interest in forfeitable property than robbery victims have in their

stolen property. 491 U. S., at 627–628. More to the point, central to the Court's decision was its observation that, because the Government obtained "title to [the defendant's] assets upon conviction," it would be "peculiar" to hold that the Sixth Amendment still gave the defendant the right to pay his attorney with those assets. *Id.,* at 628. *Monsanto* reinforced that view, holding that the pretrial restraint of assets—money to which the Government does not yet have title—is permissible even when the defendant wants to use those assets to pay for counsel. 491 U. S., at 616. True, the assets in *Caplin & Drysdale* and *Monsanto* happened to be derived from the criminal activity alleged; but the Court's reasoning in those cases was based on the Government's entitlement to recoup money from criminals who have profited from their crimes, not on tracing or identifying the actual assets connected to the crime. For this reason, the principle the Court announced in those cases applies whenever the Government obtains (or will obtain) title to assets upon conviction. Nothing in either case depended on the assets being tainted or justifies refusing to apply the rule from those cases here.

The plurality makes much of various statutory provisions that, in its view, give the United States a superior interest before trial in tainted assets but not untainted ones. See *ante,* at 8–9. That view, however, turns not on any reasoning specific to the Sixth Amendment but rather on Congress' differential treatment of tainted versus untainted assets. The plurality makes no attempt to explain why Congress' decision in §1345 to permit the pretrial restraint of substitute assets is not also relevant to its analysis. More to the point, Congress' statutory treatment of property is irrelevant to a Sixth Amendment analysis. The protections afforded by the Sixth Amendment should not turn on congressional whims.

The plurality's concern over the implications of the Government's position appears animated by a hypothetical

future case where a defendant's assets are restrained not to return stolen funds but, for example, to pay a fine. That case, however, is not the case before the Court. Section 1345 authorizes pretrial restraints to preserve substitute assets, not to provide for fines greater than the amounts stolen. The holdings in *Caplin & Drysdale* and *Monsanto*, and what should be the holding today, thus, do not address the result in a case involving a fine. The governmental interests at stake when a fine is at issue are quite separate and distinct from the interests implicated here. This case implicates the Government's interest in preventing the dissipation, transfer, and concealment of stolen funds, as well as its interest in preserving for victims any funds that remain. Those interests justify, in cases like this one, the pretrial restraint of substitute assets.

## IV

The principle the plurality and JUSTICE THOMAS announce today—that a defendant has a right to pay for an attorney with forfeitable assets so long as those assets are not related to or the direct proceeds of the crime alleged— has far-reaching implications. There is no clear explanation why this principle does not extend to the exercise of other constitutional rights. "If defendants have a right to spend forfeitable assets on attorney's fees, why not on exercises of the right to speak, practice one's religion, or travel?" *Caplin & Drysdale*, 491 U. S., at 628. Nor does either opinion provide any way to distinguish between the restraint at issue here and other governmental interferences with a defendant's assets. If the restraint of Luis' assets violates the Sixth Amendment, could the same be said of any imposition on a criminal defendant's assets? Cf. *id.*, at 631 ("[S]eizures of assets to secure potential tax liabilities . . . may impair a defendant's ability to retain counsel . . . [y]et these assessments have been upheld against constitutional attack"). If a defendant is fined in a

prior matter, is the Government barred from collecting the fine if it will leave the defendant unable to afford a particular attorney in a current case?  No explanation is provided for what, if any, limits there are on the invented exemption for attorney's fees.

The result today also creates arbitrary distinctions between defendants.  Money, after all, is fungible.  There is no difference between a defendant who has preserved his or her own assets by spending stolen money and a defendant who has spent his or her own assets and preserved stolen cash instead.  Yet the plurality and concurrence—for different reasons—find in the Sixth Amendment the rule that greater protection is given to the defendant who, by spending, laundering, exporting, or concealing stolen money first, preserves his or her remaining funds for use on an attorney.

The true winners today are sophisticated criminals who know how to make criminal proceeds look untainted. They do so every day.  They "buy cashier's checks, money orders, nonbank wire transfers, prepaid debit cards, and traveler's checks to use instead of cash for purchases or bank deposits."  Dept. of Treasury, National Money Laundering Risk Assessment 2015, p. 3.  They structure their transactions to avoid triggering recordkeeping and reporting requirements.  *Ibid.*  And they open bank accounts in other people's names and through shell companies, all to disguise the origins of their funds.  *Ibid.*

The facts of this case illustrate the measures one might take to conceal or dispose of ill-gotten gains.  In declarations relied on by the District Court, the Federal Bureau of Investigation (FBI) Special Agent investigating the case explained that "Luis transferred monies or caused the transfer of monies received from Medicare to . . . family members and companies owned by family members," including $1,471,000 to her husband, and over a million dollars to her children and former daughter-in-law.  App.

72–73. She also "used Medicare monies for foreign travel," including approximately 31 trips to Mexico, "where she owns several properties and has numerous bank accounts." *Id.,* at 73. She "transferred Medicare monies overseas through international wire transfers to Mexico." *Ibid.* And the Government was "able to trace Medicare proceeds going into [all but one of the] bank account[s] owned by Defendant Luis and/or her companies listed in the Court's" temporary restraining order. *Id.,* at 74. No doubt Luis would have enjoyed her travel and expenditures even more had she known that, were her alleged wrongs discovered, a majority of the Justices would insist that she be allowed to pay her chosen legal team at the price they set rather than repay her victim.

Notwithstanding that the Government established probable cause to believe that Luis committed numerous crimes and used the proceeds of those crimes to line her and her family's pockets, the plurality and JUSTICE THOMAS reward Luis' decision to spend the money she is accused of stealing rather than her own. They allow Luis to bankroll her private attorneys as well as "the best and most industrious investigators, experts, paralegals, and law clerks" money can buy—a legal defense team Luis claims she cannot otherwise afford. See Corrected Motion to Modify the Restraining Order in No. 12–Civ–23588, p. 13 (SD Fla., Nov. 16, 2012). The Sixth Amendment does not provide such an unfettered right to counsel of choice.

It is well settled that the right to counsel of choice is limited in important respects. A defendant cannot demand a lawyer who is not a member of the bar. *Wheat* v. *United States*, 486 U. S. 153, 159 (1988). Nor may a defendant insist on an attorney who has a conflict of interest. *Id.,* at 159, 164. And, as quite relevant here, "a defendant may not insist on representation by an attorney he cannot afford." *Id.,* at 159. As noted earlier, "those who do not have the means to hire their own lawyers have

no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale*, 491 U. S., at 624. As a result of the District Court's order, Luis simply cannot afford the legal team she desires unless they are willing to represent her without advance payment. For Sixth Amendment purposes, the only question here is whether Luis' right to adequate representation is protected. That question is not before the Court. Neither Luis nor the plurality nor JUSTICE THOMAS suggests that Luis will receive inadequate representation if she is not able to use the restrained funds. And this is for good reason. Given the large volume of defendants in the criminal justice system who rely on public representation, it would be troubling to suggest that a defendant who might be represented by a public defender will receive inadequate representation. See generally T. Giovanni & R. Patel, *Gideon* at 50: Three Reforms to Revive the Right to Counsel 1 (2013), online at http://www.brennancenter.org/sites/default/files/publications/ Gideon_Report_040913.pdf (as last visited Mar. 28, 2016). Since Luis cannot afford the legal team she desires, and because there is no indication that she will receive inadequate representation as a result, she does not have a cognizable Sixth Amendment complaint.

The plurality does warn that accepting the Government's position "would—by increasing the government-paid-defender workload—render less effective the basic right the Sixth Amendment seeks to protect." *Ante,* at 15. Public-defender offices, the plurality suggests, already lack sufficient attorneys to meet nationally recommended caseload standards. *Ibid.* But concerns about the caseloads of public-defender offices do not justify a constitutional command to treat a defendant accused of committing a lucrative crime differently than a defendant who is indigent from the outset. The Constitution does not require victims of property crimes to fund subsidies for

members of the private defense bar.

Because the rule announced today is anchored in the Sixth Amendment, moreover, it will frustrate not only the Federal Government's use of §1345 but also the States' administration of their forfeiture schemes. Like the Federal Government, States also face criminals who engage in money laundering through extensive enterprises that extend to other States and beyond. Where a defendant has put stolen money beyond a State's reach, a State should not be precluded from freezing the assets the defendant has in hand. The obstacle that now stands in the States' way is not found in the Constitution. It is of the Court's making.

Finally, the plurality posits that its decision "should prove workable" because courts "have experience separating tainted assets from untainted assets, just as they have experience determining how much money is needed to cover the costs of a lawyer." *Ante*, at 15–16. Neither of these assurances is adequate.

As to the first, the plurality cites a number of sources for the proposition that courts have rules that allow them to implement the distinction it adopts. *Ibid.* Those rules, however, demonstrate the illogic of the conclusion that there is a meaningful difference between the actual dollars stolen and the dollars of equivalent value in a defendant's bank account. The plurality appears to agree that, if a defendant is indicted for stealing $1 million, the Government can obtain an order preventing the defendant from spending the $1 million he or she is believed to have stolen. The situation gets more complicated, however, when the defendant deposits the stolen $1 million into an account that already has $1 million. If the defendant then spends $1 million from the account, it cannot be determined with certainty whether the money spent was stolen money rather than money the defendant already had. The question arises, then, whether the Government can re-

strain the remaining million.

One of the treatises on which the plurality relies answers that question. The opinion cites A. Scott's Law of Trusts to support the claim that "the law has tracing rules that help courts implement the kind of distinction . . . require[d] in this case." *Ante,* at 15–16. The treatise says that, if a "wrongdoer has mingled misappropriated money with his own money and later makes withdrawals from the mingled fund," assuming the withdrawals do not result in a zero balance, a person who has an interest in the misappropriated money can recover it from the amount remaining in the account. 4 A. Scott, Law of Trusts §518, pp. 3309–3310 (1956). Based on this rule, one would expect the plurality to agree that, in the above hypothetical, the Government could restrain up to the full amount of the stolen funds—that is, the full $1 million— without having to establish whether the $1 million the defendant spent was stolen money or not. If that is so, it is hard to see why its opinion treats as different a situation where the defendant has two bank accounts—one with the $1 million from before the crime and one with the stolen $1 million. If the defendant spends the money in the latter account, the Government should be allowed to freeze the money in the former account in the same way it could if the defendant spent the money out of a single, commingled account. The Sixth Amendment provides no justification for the decision to mandate different treatment in these all-but-identical situations.

The plurality sees "little reason to worry" about defendants circumventing forfeiture because courts can use rules like the tracing rule discussed above. *Ante,* at 16. It also asserts that these rules "will likely . . . prevent Luis from benefiting from many of [her] money transfers and purchases." *Ibid.* That proposition is doubtful where, as here, "a lot of money was taken out in cash from the defendant's bank accounts" because "[y]ou can't trace cash." App. 155.

Even were that not the case, this assertion fails to appreciate that it takes time to trace tainted assets. As the FBI agent testified, at the time of the hearing both the tracing and the FBI's analysis were "still ongoing." *Ibid.* The whole purpose of a pretrial restraint under §1345 is to maintain the status quo in cases, like this one, where a defendant is accused of committing crimes that involve fungible property, *e.g.,* a banking law violation or a federal health care offense. The plurality's approach serves to benefit the most sophisticated of criminals whose web of transfers and concealment will take the longest to unravel. For if the Government cannot establish at the outset that every dollar subject to restraint is derived from the crime alleged, the defendant can spend that money on whatever defense team he or she desires.

Of equal concern is the assertion that a defendant's right to counsel of choice is limited to only those attorneys who charge a "reasonable fee." *Ante,* at 16. If Luis has a right to use the restrained substitute assets to pay for the counsel of her choice, then why can she not hire the most expensive legal team she can afford? In the plurality's view, the reason Luis can use the restrained funds for an attorney is because they are still hers. But if that is so, then she should be able to use all $2 million of her remaining assets to pay for a lawyer. The plurality's willingness to curtail the very right it recognizes reflects the need to preserve substitute assets from further dissipation.

\*    \*    \*

Today's ruling abandons the principle established in *Caplin & Drysdale* and *Monsanto.* In its place is an approach that creates perverse incentives and provides protection for defendants who spend stolen money rather than their own.

In my respectful view this is incorrect, and the judgment of the Court of Appeals should be affirmed.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–419

_____

## SILA LUIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[March 30, 2016]

JUSTICE KAGAN, dissenting.

I find *United States* v. *Monsanto*, 491 U. S. 600 (1989), a troubling decision. It is one thing to hold, as this Court did in *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617 (1989), that a convicted felon has no Sixth Amendment right to pay his lawyer with funds adjudged forfeitable. Following conviction, such assets belong to the Government, and "[t]here is no constitutional principle that gives one person the right to give another's property to a third party." *Id.,* at 628. But it is quite another thing to say that the Government may, prior to trial, freeze assets that a defendant needs to hire an attorney, based on nothing more than "probable cause to believe that the property will ultimately be proved forfeitable." *Monsanto*, 491 U. S., at 615. At that time, "the presumption of innocence still applies," and the Government's interest in the assets is wholly contingent on future judgments of conviction and forfeiture. *Kaley* v. *United States*, 571 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 6). I am not altogether convinced that, in this decidedly different circumstance, the Government's interest in recovering the proceeds of crime ought to trump the defendant's (often highly consequential) right to retain counsel of choice.

But the correctness of *Monsanto* is not at issue today. Petitioner Sila Luis has not asked this Court either to overrule or to modify that decision; she argues only that it

does not answer the question presented here. And because Luis takes *Monsanto* as a given, the Court must do so as well.

On that basis, I agree with the principal dissent that *Monsanto* controls this case. See *ante,* at 5–7 (opinion of KENNEDY, J.). Because the Government has established probable cause to believe that it will eventually recover Luis's assets, she has no right to use them to pay an attorney. See *Monsanto,* 491 U. S., at 616 ("[N]o constitutional violation occurs when, after probable cause is adequately established, the Government obtains an order barring a defendant from . . . dissipating his assets prior to trial").

The plurality reaches a contrary result only by differentiating between the direct fruits of criminal activity and substitute assets that become subject to forfeiture when the defendant has run through those proceeds. See *ante,* at 5–6. But as the principal dissent shows, the Government's and the defendant's respective legal interests in those two kinds of property, prior to a judgment of guilt, are exactly the same: The defendant maintains ownership of either type, with the Government holding only a contingent interest. See *ante,* at 7–10. Indeed, the plurality's use of the word "tainted," to describe assets at the preconviction stage, makes an unwarranted assumption about the defendant's guilt. See *ante,* at 5 (characterizing such assets as, for example, "robber's loot"). Because the Government has not yet shown that the defendant committed the crime charged, it also has not shown that allegedly tainted assets are actually so.

And given that money is fungible, the plurality's approach leads to utterly arbitrary distinctions as among criminal defendants who are in fact guilty. See *ante,* at 12 (opinion of KENNEDY, J.). The thief who immediately dissipates his ill-gotten gains and thereby preserves his other assets is no more deserving of chosen counsel than

KAGAN, J., dissenting

the one who spends those two pots of money in reverse order. Yet the plurality would enable only the first defendant, and not the second, to hire the lawyer he wants. I cannot believe the Sixth Amendment draws that irrational line, much as I sympathize with the plurality's effort to cabin *Monsanto*. Accordingly, I would affirm the judgment below.