# IN THE COURT OF APPEALS OF IOWA

No. 15-0772
Filed January 25, 2017

**ROBERT KROGMANN,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.

_____

Appeal from the Iowa District Court for Delaware County, Thomas A. Bitter, Judge.

Robert Krogmann appeals the denial of his postconviction relief application. **AFFIRMED.**

Angela L. Campbell of Dickey & Campbell Law Firm, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee State.

Heard by Vogel, P.J., and Vaitheswaran and McDonald, JJ.

**VAITHESWARAN, Judge.**

Robert Krogmann shot his girlfriend several times. A jury found him guilty of attempted murder and willful injury, and the supreme court affirmed his judgment and sentence. *See State v. Krogmann*, 804 N.W.2d 518 (Iowa 2011).[1]

Krogmann filed a postconviction relief application raising several ineffective-assistance-of-counsel claims. The district court denied the application following an evidentiary hearing.

On appeal, Krogmann asserts his trial attorney was ineffective in (A) resisting an asset freeze and failing to object to the prosecutor's handling of the freeze, (B) failing to call stronger experts in support of his diminished responsibility defense, (C) failing to file a mistrial motion, (D) failing to obtain the phone records documenting his 911 calls, (E) failing to obtain his mental health records, (F) failing to object to the prosecutor's cross examination of him about a 911 call, and (G) failing to object to the prosecutor's arguably inconsistent positions with respect to his diminished responsibility defense and conservatorship. Krogmann also contends his sentences should have merged.

## I.  Ineffective Assistance

To succeed on his ineffective-assistance-of-counsel claims, Krogmann must show (1) deficient performance and (2) prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance requires a showing of "errors so serious that counsel was not functioning as the 'counsel'

---

[1] The background facts are detailed in the prior opinion and will be repeated here only to the extent they bear on the specific issues raised in Krogmann's postconviction relief application. *See Krogmann*, 804 N.W.2d at 520-22.

guaranteed the defendant by the Sixth Amendment." *Id.* Prejudice requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "If we conclude a claimant has failed to establish either of these elements, we need not address the remaining element." *State v. Thorndike*, 860 N.W.2d 316, 320 (Iowa 2015). Because ineffective assistance of counsel claims have their basis in the Sixth Amendment to the United States Constitution, our review is de novo. *State v. Hoskins*, 711 N.W.2d 720, 725 (Iowa 2006).

### A.    Asset Freeze

Shortly after the State filed charges against Krogmann, the prosecutor applied for an order "freezing all of [Krogmann's] assets." The prosecutor asserted Krogmann might attempt to sell or transfer his assets "to avoid his financial obligations to the victim of his offenses" before "criminal and/or civil restitution [could be] established."

The district court entered a freeze order but gave Krogmann permission to "make application to the Court for the sale or transfer of an asset at which time [it would] determine whether good cause ha[d] been shown to grant the application."

Krogmann's attorney did not receive a copy of the State's application for a freeze until after the district court ruled. He filed a post-ruling resistance, which the district court did not address, and an application for interlocutory review, which the Iowa Supreme Court denied.

Meanwhile, Krogmann sought and obtained a conservatorship of his extensive assets. When he applied to have conservatorship funds dispersed to him, the district court required him to serve the applications on the victim and prosecutor. Both routinely weighed in on Krogmann's requests for funds.

Following trial, the district court required Krogmann to pay the victim restitution of $53,789.68. The total amount subject to the asset freeze was approximately $3.3 million.

On direct appeal, Krogmann argued the asset freeze "was contrary to Iowa law and also violated his constitutional rights to due process, to be free from unreasonable seizures, and to counsel." *Krogmann*, 804 N.W.2d at 522. The court concluded Krogmann failed to preserve error "on his objections to the asset freeze" because he "did not make a timely or sufficient objection to th[e] freeze." *Id.* at 523-25. While the court could have stopped there, it went on to express concern with the prosecutor's exploitation of the asset freeze remedy:

> Our determination that Krogmann has failed to preserve error does not mean we approve of the asset freeze. We are troubled by the State's effort to tie up a criminal defendant's personal assets without citing any rule or statute, without making a verified finding, and without citing the district court to relevant authority . . . . We are also troubled by the State's attempts to use the asset freeze, once it was in place, to object to defense expenditures not on the ground they would jeopardize restitution or other victim compensation (the alleged reasons for the asset freeze), but simply because the State deemed them unnecessary.

*Id.* at 525. The court did not foreclose an ineffective assistance claim challenging counsel's inaction with respect to the asset freeze. *Id.* at 525 n.8

Krogmann pursued this claim. He alleged his trial attorney was ineffective in failing to "properly preserve an objection to the court['s] freez[e of] [his] assets

before trial," "file a motion to reconsider the freezing of [his] assets after the court entered the order," or "file an application to terminate the freeze order and . . . cite clear and controlling authority revealing that the freeze order could not properly be continued." He asserted he was "denied his right to counsel pursuant to the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 10 of the Iowa Constitution, due to the State's invasion of such right and defense counsel['s] ineffective resistance to same."

In ruling on the claim, the postconviction court stated, "[I]t seems clear that Krogmann's counsel failed to properly raise his objection to the asset freeze. He filed an objection, but he should have insisted on a ruling and/or requested a hearing. He did neither. Such action fell below the standard demanded of a reasonably competent attorney." Nonetheless, the court concluded Krogmann "failed to prove any reasonable probability of a different result."

On appeal, Krogmann asserts,

[I]t was ineffective assistance of counsel to not properly object to the asset freeze, not sufficiently preserve the issue for interlocutory or direct appeal, to fail to file a motion to reconsider the freezing of the assets, to fail to object to the prosecutor and victim's participation in the asset freeze and application for funds, to fail to file an application to terminate the freeze order, to fail to cite clear controlling authority, and to fail to raise the prejudice the asset freeze was causing [him] at the trial level.

These claims boil down to an assertion that counsel failed to properly challenge the asset freeze. The State responds with an error preservation concern that we find unpersuasive. Accordingly, we proceed to the merits.

Krogmann begins by noting "[a]sset freezes are not allowed to be used the way they were used in this particular case." He is correct. In *State ex rel. Pillers*

*v. Maniccia*, 343 N.W.2d 834, 835 (Iowa 1984), a county attorney filed a petition "ask[ing] for an injunction to restrain the defendants from selling, disposing of, or converting any of their personal or real property . . . without court approval." The court framed the issue as follows: "Can persons charged with crime be enjoined from disposing of property which might otherwise be used to reimburse their alleged victims or the county?" *Maniccia*, 343 N.W.2d at 836. In the court's view, "the cure sought by the county attorney [was] apt to be worse than the disease" because "[m]ost or all of the assets which the State seeks to freeze might lawfully belong to the defendants" and therefore "might be needed to finance their defense." *Id.* The court continued, "Under our criminal justice system defendants are presumed innocent of the pending charges. They are entitled to a trial. The possible injustice to them is not outweighed by the possible advantage to the county." *Id.* The court disallowed the injunction. *Id.*

We do not expect a defense attorney to be clairvoyant. *See Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008). But we do expect the attorney to cite long-standing precedent. *Maniccia* is such precedent and is controlling. As the Iowa Supreme Court stated in Krogmann's direct appeal, "The only difference [between *Maniccia* and Krogmann's case] is that the State sought the order within the criminal case, instead of filing a separate civil action for injunctive relief." *Krogmann*, 804 N.W.2d at 523. The court essentially found this to be a distinction without a difference, reasoning as follows:

> [T]he State has the statutory right to seek a criminal restitution lien to protect both its interests and those of the victim. *See* Iowa Code § 910.10. Indeed, it requested and received such a lien. Under these circumstances, one might well question the State's ability to

obtain inherent injunctive relief beyond the statutory remedy already afforded by section 910.10.

*Id.* at 523-24. Because *Mannicia* was filed more than twenty-five years before the prosecutor sought a freeze of Krogmann's assets, we conclude Krogmann's attorney breached an essential duty in failing to bring the opinion to the district court's attention.

We turn to the prejudice prong. Krogmann argues "he should not have to show traditional prejudice." In his view, the asset freeze prevented him from "using his money in his criminal case as he saw fit," in violation of his rights to counsel under the Sixth Amendment to the United States Constitution and article 1, section 10 of the Iowa Constitution. He contends prejudice should be presumed.

Our courts have presumed error where the errors "affect[] the framework within which the trial proceeds." *Lado v. State*, 804 N.W.2d 248, 251-52 (Iowa 2011). These structural errors allow a defendant to bypass the showing of a different outcome "because such an analysis 'would be speculative inquiry into what might have occurred in an alternate universe.'" *Id.* at 252 (citation omitted).

> We have recognized structural error occurs when: (1) counsel is completely denied, actually or constructively, at a crucial stage of the proceeding; (2) where counsel does not place the prosecution's case against meaningful adversarial testing; or (3) where surrounding circumstances justify a presumption of ineffectiveness, such as where counsel has an actual conflict of interest in jointly representing multiple defendants.

*Id.*

In *Lado*, the court determined the defendant was constructively denied counsel where his attorney stood by as the court dismissed his postconviction

relief application for failure to pursue it. *See id.*; *see also* Iowa R. Civ. P. 1.944. The court stated, "This is the type of error that renders the entire postconviction relief proceeding 'presumptively unreliable.'" *Lado*, 804 N.W.2d at 253.

The United States Supreme Court also addressed structural error in a recent opinion with a strikingly similar issue as the issue raised by Krogmann. In *Luis v. United States*, ___ U.S. ___, 136 S. Ct. 1083 (2016), the question presented was "whether the pretrial restraint of a criminal defendant's legitimate, untainted assets (those not traceable to a criminal offense) needed to retain counsel of choice violates the Fifth and Sixth Amendments." *Luis*, 136 S. Ct. at 1088. The Court answered yes to this question. *Id.* The Court stated,

> [I]nsofar as innocent (*i.e.*, untainted) funds are needed to obtain counsel of choice, we believe that the Sixth Amendment prohibits the court order that the Government seeks . . . .
> . . . .
> We have found no decision of this Court authorizing unfettered, pretrial forfeiture of the defendant's own "innocent" property—property with no connection to the charged crime.

*Id.* at 1093-94. The Court vacated a district court freeze order and remanded the case for further proceedings. *Id.* at 1096. In doing so, the Court reaffirmed prior holdings concluding "the wrongful deprivation of the right to counsel" was "a 'structural error'" and "courts may not even ask whether the error harmed the defendant." *Id.* at 1089; *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006) (concluding "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation" because "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received").

In deciding whether to find structural error, then, we must first ask whether the asset freeze ordered by the district court deprived Krogmann of his counsel of choice. The record reveals that Krogmann hired not one but three attorneys of his own choosing—one in the pre-trial phase, a second in the pretrial and trial phases, and a third for his direct appeal. The district court paid all three from conservatorship funds. As the postconviction court found, Krogmann "was permitted to use around $67,000 of his own funds to pay [his attorney] for trial preparation and for trial" and "significant funds (at least $20,000) for his appeal." Because Krogmann was allowed to obtain counsel of his choice despite the freeze order, we will not find structural error based on a denial of counsel.

This does not end our analysis because a finding of structural error may be warranted if the freeze order impinged upon defense counsels' ability to perform their jobs. *See Maine v. Moulton*, 474 U.S. 159, 170-71 (1985) ("Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. . . . [A]t the very least, the prosecutor . . . ha[s] an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel."); *United States v. Stein*, 541 F.3d 130, 156-57 (2d Cir. 2008) (stating "the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain"

and presuming prejudice where the State effectively impaired the defendants' "ability to mount a defense" by restricting the activities of counsel).

In *Stein*, the defendants claimed "that the government unjustifiably interfered with their relationship with counsel and their ability to mount the best defense they could muster." *Stein*, 541 F.3d at 154. The court agreed, stating the government caused the defendants' employer, who "would have paid defendants' legal fees and expenses," to "impose conditions on the advancement of legal fees[,] . . . to cap the fees, and ultimately to end payment." *Id.* at 135, 156. The court cited the "novel theory of criminal liability," the "substantial penalties" the defendants faced, "the relevant facts . . . scattered throughout over 22 million documents," the complexity of the subject matter, the complexity of the litigation, the "technical expertise . . . needed to figure out and explain what happened," and the length of the expected trial. *Id.* The court found the government "failed to establish a legitimate justification for interference with [the] advancement of legal fees." *Id.* at 156. The inconsistency of the government's position was highlighted as follows:

> The government conceded at oral argument that it is in the government's interest that every defendant receive the best possible representation he or she can obtain. A company that advances legal fees to employees may stymie prosecutors by affording culpable employees with high-quality representation. But if it is in the government's interest that every defendant receive the best possible representation, it cannot also be in the government's interest to leave defendants naked to their enemies.

*Id.* at 157. The district court's dismissal of the indictments against the defendants whose fee arrangements were restricted as well as the defendants who were denied counsel of choice was affirmed. *See id.* at 157-58.

Like the *Stein* defendants who had access to their employer's funds to mount their defense, Krogmann was of sufficient means to muster the best defense possible and could have expended funds on defense strategies that might have been deemed unnecessary to someone of lesser means. But for the asset freeze, he would have had to answer to no one. Because of the freeze, Krogmann was forced to obtain the court's prior approval to spend his own money, subject to the objections of the prosecutor.

And object he did. The prosecutor objected to the retention of a psychologist on the ground that the defense failed to name or disclose a psychologist. He also objected to defense counsel's retention of a jury consultant on the ground that the service was "a luxury rather than a necessity." These objections were successful. The district court ruled, "[N]o disbursements shall be made nor monies expended for any psychologist not previously named or otherwise disclosed to the State as a witness or expert or for the engagement or employment of the jury/trial consultant."

The prosecution provided no justification for the objections other than the initial claim that the freeze was necessary to preserve funds for restitution. However, the restitution amount was a tiny fraction of Krogmann's assets and, as the Iowa Supreme Court noted on direct appeal, was preserved through a restitution lien. *Krogmann*, 804 N.W.2d at 523-24.

These actions might warrant a finding of structural error. *See United States v. Stein*, 435 F. Supp. 2d 330, 371-72 (S.D.N.Y. 2006) (noting "[p]roperly defending this case, in all its complexity, has required, and will continue to require, substantial financial resources," and "[i]n these circumstances,

demonstrating prejudice after the fact would be all but impossible" and concluding "there is no need for a particularized showing of prejudice here").[2] But the facts do not fit neatly into the structural error scenarios set forth in *Lado*. 804 N.W.2d at 252. First, as discussed, counsel was not completely denied; Krogmann retained attorneys of his choice. Second, Krogmann's trial attorney tested the prosecution's case through cross-examination and by presenting witnesses for the defense. Third, the surrounding circumstances did not evince an obvious structural concern such as a conflict of interest. *But see Stein*, 435 F. Supp. 2d at 371 (finding support for a structural error analysis in "cases involving criminal defense counsel burdened by conflicts of interest"). The district court took pains to emphasize that defense counsel's fee requests—requests directly implicating the right to counsel—would be granted. In approving trial counsel's request for $35,000, the court stated:

> [T]he Court will not refuse to pay the[] sums as [Krogmann] has a right to competent counsel under the Sixth Amendment to the Constitution of the United States. . . . [T]he conservator shall act on [Krogmann's] best interest to ensure that [he] receives the defense he is entitled to in these proceedings and continues to require counsel to present itemized billing statements concerning fees incurred in these matters.

That said, one surrounding circumstance bears further discussion: the district court's decision to require service of Krogmann's expense applications on

---

[2] One court distinguished *Stein*'s structural error discussion on the ground that a *Strickland* prejudice analysis was not possible at the pretrial phase of that case. *See United States v. Stodder*, No. 2:05-CR-00027, 2006 WL 3066196, at *2 (C.D. Cal. Oct. 4, 2006). The court stated that defendant's motion, in contrast, was "made post-trial and the Court [was] in a position to determine that no constitutional violation, and therefore no prejudice, ha[d] occurred." *Id.* We question the propriety of focusing on the stage of trial in deciding whether to apply a structural error analysis or an outcome-determinative prejudice analysis. Even post trial, a structural error analysis may be appropriate where the "ability to present the defense [of choice] has been compromised." *Stein*, 435 F. Supp. 2d at 369.

the prosecutor, potentially affording the prosecutor access to trial strategy and work product. We must decide whether this potential access warrants a structural error analysis.

The Iowa Supreme Court broached the subject in *State v. Dahl*, 874 N.W.2d 348, 352 (Iowa 2016). There, the court was faced with an indigent defendant's application for reasonably necessary defense services in the form of a private investigator. *Dahl*, 874 N.W.2d at 351-52. The court held, "Disclosure of the defense counsel's trial strategy to the State impairs an indigent defendant's right to effective assistance of counsel." *Id.* at 352. However, the court did not endorse a wholesale prohibition of State access to defense expense applications. Instead, the court approved a protocol that limited the State's ability to delve into defense strategy but afforded the State an opportunity to resist applications believed to be prejudicial to the administration of justice. *Id.* at 353. Under the protocol, the defendant was obligated to file a timely application stating the name of the investigator, a cost estimate, and, "if possible, a general description of what services the investigator will provide." *Id.* The district court was to "give the State an opportunity to resist the application" and "appear and participate in a hearing regarding the application." *Id.* If the trial court believed an application might have merit but did not contain adequate information for the court to determine whether the application should be granted, the court was to "hold an ex parte hearing before ruling on the merits of the application" and "seal any transcript or order that would disclose defense strategy or work product and file a separate order announcing its decision to grant or deny the application." *Id.*

An obvious difference between Dahl and Krogmann is wealth. Dahl was an indigent defendant whose litigation expenses came from the State coffers, whereas Krogmann was a wealthy farmer who could single-handedly fund his defense. *See Griffin v. Illinois*, 351 U.S. 12, 23 (1956) (Frankfurter, J., concurring) ("A man of means may be able to afford the retention of an expensive, able counsel not within reach of a poor man's purse."); *State v. Touchet*, 642 So. 2d 1213, 1215 (La. 1994) (stating the obligation to provide the "'basic tools of an adequate defense,' at no cost to [an] indigent defendant" stemmed from the belief that "[t]here can be no equal justice where the kind of trial a man gets depends upon the amount of money he has" (citations omitted)); *see also Luis*, 136 S. Ct. at 1090 (noting the untainted funds of the defendant "belong[ed] to" him); *Maniccia*, 343 N.W.2d at 836 (same). There is no reason to believe this protocol would apply to defendants funding their own defense. But, because *Dahl* speaks to the issue of prosecutorial interference with defense strategy or work product, we will assume without deciding the protocol is applicable.

In Krogmann's case, the protocol was not breached. Although Krogmann was forced to notify the prosecutor of his fund requests, he was not forced to divulge defense strategy or work product. For example, trial counsel sent a letter to the court requesting $12,000, which he asked to be reviewed in camera. The letter stated only that he would need the funds "to cover [his] trial time and trial preparation." Similarly, counsel's application for the payment of litigation-related expenses in the form of a psychologist and jury consultant did not divulge how the defense intended to use the psychologist or what the jury consultant hoped to

glean in analyzing the jury venire.[3]  Even after the prosecutor objected, no disclosure of trial strategy or work product was required.  Acknowledging Krogmann could have retained the services of the psychologist and jury consultant had his personal funds been freely accessible to him, the procedure the district court employed did not compromise Krogmann's defense by coercing the disclosure of trial strategy and work product.  *See United States v. Marshall*, No. 5:15-CR-36, 2016 WL 3937514, at *6 (N.D.W. Va. July 18, 2016) (finding most of restrained funds were available for reasonable fees and expenses but directing "the submission of a proposed budget from defense counsel, to be filed ex parte, for review by the Court").  Because trial strategy and work product was not disclosed, we decline to find structural error.[4]

This brings us to the outcome-determinative prejudice standard set forth in *Strickland*.  No precedent that we can find directly addresses *Strickland* prejudice in the context of defense counsel's failure to properly challenge a freeze order.  But we have applied the standard in analyzing claims that counsel was ineffective in failing to retain experts.  *See Hilson v. State*, No. 15-0679, 2016 WL 6652329, at *2 (Iowa Ct. App. Nov. 9, 2016); *Sirovy v. State*, No. 13-0095, 2014 WL 955130, at *1 (Iowa Ct. App. Mar. 12, 2014).  And other jurisdictions have applied the same standard in denying claims based on defense counsel's failure to retain a jury consultant.  *See Robinson v. State*, No. W2011-00967-CCA-R3-PD, 2013 WL 1149761, at *68 (Tenn. Crim. App. Mar. 20, 2013) (rejecting claim

---

[3] The court also denied Krogmann's request for a bond payment.  The State did not register an objection to this payment; only the victim did.  Accordingly, we decline to consider this denial of payment.

[4] Krogmann argues disclosure of trial strategy and work product also supports a finding of *Strickland* prejudice.  Our conclusion that none was disclosed resolves this argument.

that counsel was ineffective in failing to retain a jury consultant on the ground that postconviction relief applicant "failed to present evidence supporting his claim that the jury was not fair and impartial"); *Allen v. State*, No. E2010-01971-CCA-R3-PC, 2012 WL 826522, at \*8 (Tenn. Crim. App. Mar. 13, 2012) ("[T]he Petitioner has presented no evidence as to how [the failure to hire a jury consultant] prejudiced his defense."); *United States v. Olis*, No. H-03-217-01, 2008 WL 5046342, at \*30 (S.D. Tex. Nov. 21, 2008) (reviewing ineffective assistance claim based on failure to hire a jury consultant and retain expert witnesses and concluding "[a] review of the record establishes that even if trial counsel had taken the steps that Olis now argues should have been taken, the result would have been the same").  Because the freeze order affected Krogmann's retention of a psychologist and jury consultant, we find these opinions persuasive.  We will apply a *Strickland* prejudice analysis in deciding whether counsel's breach of duty in failing to properly challenge the freeze order requires reversal.

As discussed below, Krogmann retained a well-credentialed trial expert to opine on his diminished responsibility defense.  This expert met with Krogmann, reviewed his medical records, and evaluated him.  There is no indication that an additional psychologist would have added a new or different perspective to the mental health defense.

In attempting to establish prejudice on his request for a jury consultant, Krogmann called a jury consultant as a witness at the postconviction hearing.  She testified that, if she had been involved, she would have insisted defense counsel object to seating fifteen rather than twelve jurors and three alternates.

She also stated she would have posed follow-up questions to the jury panel during voir dire. While she opined that the jury likely would have been composed of different people had she been involved, there is scant if any evidence that a different jury might have reached a different result.

As noted, Krogmann shot his girlfriend several times. He admitted to the shooting and relied on the diminished responsibility defense which, as discussed below, found only weak support in the record. Without belaboring the facts, we conclude there is no reasonable probability of a different outcome had counsel succeeded in obtaining a psychologist and jury consultant.

Krogmann also raises his challenge to the handling of the freeze order as a prosecutorial misconduct claim but essentially concedes this claim would have to be analyzed under an ineffective assistance of counsel rubric. Accordingly, we decline to engage in a separate analysis. In addition, recent precedent would suggest the prosecutor's action with respect to the freeze order was less prosecutorial misconduct than prosecutorial error. *See State v. Schlitter*, 881 N.W.2d 380, 394 (Iowa 2016) ("Prosecutorial error occurs where the prosecutor exercises poor judgment and where the attorney has made a mistake based on excusable human error, despite the attorney's use of reasonable care." (citation omitted)).

We affirm the district court's denial of Krogmann's ineffective-assistance-of-counsel claim premised on the freeze order.

### B. Failure to Call Stronger Experts

Krogmann contends his trial attorney "failed to hire sufficient experts to maintain a viable mental health defense." He concedes defense counsel called

an expert to support his diminished responsibility defense but argues the expert only provided a weak statement.

The choice of an expert is the hallmark of a strategic decision. *See Schrier v. State*, 347 N.W.2d 657, 663 (Iowa 1984). At the postconviction relief hearing, Krogmann's attorney testified he consulted with "gifted lawyers in this area" before retaining the expert who testified. He stated the expert "kind of work[ed] both sides fair[ly] and, I think, equally, and I think that buil[t] his credibility." He opined that the expert was "very gifted," "very qualified," and "did a very good job."

The attorney's assessment finds support in the record. As noted, the expert met with Krogmann, reviewed his medical records dating back to 1995, and independently diagnosed Krogmann with bipolar disorder punctuated with "hypomania," a diagnosis that corroborated Krogmann's testimony of long-standing depression. We acknowledge his ultimate opinion on whether Krogmann's diagnosis could have influenced his intent on the day of the shooting was framed in terms of a possibility rather than a probability. But the "stronger expert" identified by Krogmann at the postconviction relief hearing also framed his opinion as a possibility. He stated, "There is a possibility that at the time of the crime [Krogmann] may have had a brief psychotic episode as well as being severely depressed." If Krogmann was searching for an expert who would provide a more forceful opinion, this expert did not advance his cause. We conclude Krogmann's trial attorney did not breach an essential duty in failing to call "multiple, and stronger, experts for Krogmann."

### C.    Mistrial Motion

Krogmann contends his trial attorney was ineffective in "failing to file a mistrial [motion] after the prosecutor's statement 'have you shot anybody today.'" The Iowa Supreme Court addressed the prosecutor's statement on direct appeal. *Krogmann*, 804 N.W.2d at 526-27. The court preliminarily stated Krogmann could not "obtain a new trial based on prosecutorial misconduct when he failed to move for a mistrial at the time." *Id.* However, the court went on to address the merits of the misconduct claim and concluded the question was "inflammatory and improper" but "isolated" and not "so severe or pervasive that it affected Krogmann's right to a fair trial." *Id.* In light of the court's rejection of this prosecutorial misconduct claim, we conclude Krogmann's trial attorney did not breach an essential duty in failing to challenge the prosecutor's question.

### D.    *Phone Records*

Krogmann contends his trial attorney provided ineffective assistance in "failing to obtain the phone records necessary to demonstrate [he] had called 911 so as to prevent the false assertion at trial by the prosecution that he had not called 911." His attorney addressed this issue at the postconviction relief hearing. He testified, "I have some real vague memory that maybe the call was not that favorable to Robert, by his tone and demeanor and maybe what he said or didn't say." He continued, "I think the content of the call was not very favorable, because, again, I think it was Robert that was deceptive about he would not give his name or state some details, so to say." This testimony establishes that the decision not to obtain the phone records was strategic. We conclude Krogmann's trial attorney did not breach an essential duty in failing to obtain documentation of the 911 call.

### E.    Mental Health Records

Krogmann argues his trial attorney was ineffective in "failing to obtain [his] mental health records in support of his mental health defense."  The records would have added little to the defense because Krogmann's expert testified to the contents of those records, as did Krogmann.  We conclude counsel did not breach an essential duty in failing to obtain the mental health records.

### F.    Prosecutorial Misconduct – 911 Call

Krogmann next contends, "[I]t was prosecutorial misconduct for the prosecutor to improperly ask, and imply, and extensively cross examine at trial, around the question of whether and when [he] had called for help, knowing, and having in his possession, the 911 tapes showing that [he] had, in fact, called for help."

The Iowa Supreme Court recently refined the concept of prosecutorial misconduct, making a distinction between misconduct and error.  *See Schlitter*, 881 N.W.2d at 393-94.  The court included within the definition of prosecutorial misconduct "those statements 'where a prosecutor intentionally violates a clear and unambiguous obligation or standard imposed by law, applicable rule or professional conduct,' as well as 'those situations where a prosecutor recklessly disregards a duty to comply with an obligation or standard.'"  *Id.* at 394 (citation omitted).  The court stated:

> The range of trial conduct by prosecutors falling into the category of claims referred to as "prosecutorial misconduct" includes questioning witnesses about others' deceit, distorting testimony, making unsupported statements during closing argument, stating the defendant lied during testimony, diverting the jury from deciding the case based on the evidence, making other inflammatory or prejudicial statements about the defendant, and more.

*Id.* at 393. The court distinguished this type of conduct from "prosecutorial error," which the court defined as "exercise[] [of] poor judgment" and "a mistake" based on "excusable human error, despite the attorney's use of reasonable care." *Id.* at 394 (citation omitted).

We view Krogmann's claim as a claim that the prosecutor distorted the record, which the court cited as an example of prosecutorial misconduct. This prosecutorial misconduct claim fails because the prosecutor did not distort the record.

There is no dispute Krogmann made 911 calls following the shooting. On direct examination, he testified that, while he did not recall making the calls, dispatcher records documented them. On cross-examination, the prosecutor questioned Krogmann about the timing of the calls. He attempted to portray Krogmann as hard-hearted by eliciting an admission that Krogmann called his son before making a 911 call. The prosecutor's questioning fell within the parameters of direct examination and, while pointed, was a fair inquiry in light of the testimony elicited on direct examination. Accordingly, we find no breach of an essential duty in defense counsel's failure to object to this questioning.

### G. *Prosecutorial Misconduct – Inconsistent Positions*

Krogmann contends his trial attorney was ineffective in "contesting [his] diminished capacity defense at trial while simultaneously setting forth to the court that [he] needed the conservatorship to control his assets." As the State points out, the prosecutor did not insist on a conservatorship; the application came from Krogmann. Because Krogmann cannot establish that the State took inconsistent

positions or engaged in hypocrisy in its advocacy, this prosecutorial misconduct claim also fails. Accordingly, we find no breach of an essential duty in defense counsel's failure to bring this claimed inconsistency to the court's attention.

## II. Merger

Krogmann was sentenced to consecutive sentences of twenty-five years for attempted murder and ten years for willful injury. He contends "the two offenses should have merged, and the [D]ouble [J]eopardy [C]lause of the federal [C]onstitution should prevent the consecutive sentences that he received for the two counts." Krogmann concedes his argument "is in direct contravention of *State v. Clarke*, 475 N.W.2d 193 (Iowa 1991)" but argues "*Clarke* . . . is distinguishable, erroneous, and should be overruled, if it has not already been."

In *Clarke*, the Iowa Supreme Court held "[a]pplication of the legal elements test plainly demonstrates that willful injury is not a lesser-included offense of attempted murder." 475 N.W.2d at 196. This court reaffirmed the holding of *Clarke* in multiple opinions. *See Rausch v. State*, No. 14-0509, 2015 WL 576064, at *3 (Iowa Ct. App. Feb. 11, 2015); *Bell v. State*, No. 13-1128, 2014 WL 5243351, at *4 (Iowa Ct. App. Oct. 15, 2014); *State v. Zmuda*, No. 11-0563, 2012 WL 470201, at *2 (Iowa Ct. App. Feb. 15, 2012); *Shimko v. State*, No. 09-1815, 2011 WL 3115935, at *3 (Iowa Ct. App. July 27, 2011); *Cole v. State*, No. 07-0723, 2008 WL 782759, at *3 (Iowa Ct. App. Mar. 26, 2008); *State v. Ronni*, No. 02-0590, 2003 WL 1524571, at *1 (Iowa Ct. App. Mar. 26, 2003); *State v. Haskins*, 573 N.W.2d 39, 44 n.1 (Iowa Ct. App. 1997). We see no basis for distinguishing these opinions. Additionally, recent Iowa Supreme Court precedent cited by Krogmann as potentially requiring a different outcome is

inapposite. Finding no merger of the offenses, we conclude the district court did not err in sentencing Krogmann to consecutive sentences.

We affirm Krogmann's judgment and sentences.

**AFFIRMED.**